EXHIBIT A

**NORFOLK SHERIFF'S OFFICE**
CIVIL PROCESS DIVISION
181 PARKINGWAY
P.O. Box 699245
Quincy, MA 02269

3Phase Elevator Corp.
60 Shawmut Avenue
Canton MA 02021

20003588

(TO PLAINTIFF'S ATTORNEY: *Please Circle Type of Action Involved:* -  TORT  -  MOTOR VEHICLE TORT  -  CONTRACT  -  EQUITABLE RELIEF  -  OTHER.)

# COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss.

SUPERIOR COURT
CIVIL ACTION
No.

*2077CV00443*

Allied Elevator Group, Inc., et al ........................................................................, Plaintiff(s)

*v.*

3Phase Elevator Corp. ........................................................................, Defendant(s)

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve upon  Russell Z. Goldberg, Esquire  ,

plaintiff's attorney, whose address is 5 Essex Green Drive Suite 34 Peabody, MA 01906 , an answer to the

complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the

day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the

complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at

56 Federal St Salem,MA   either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13 (a), your answer must state as a counterclaim any claim which you may
have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's
claim or you will thereafter be barred from making such claim in any other action.

WITNESS, Judith Fabricant, Esquire, at Salem, the 29th
day of May , in the year of our Lord two thousand twenty

A TRUE COPY. ATTEST:

DEPUTY SHERIFF
DATE 07/20/2020

Thomas H. Driscoll Jr.
*Clerk*

NOTICE TO DEFENDANT - You need not appear personally in court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein *and* also file the original in the Clerk's Office.

NOTES:
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.

## PROOF OF SERVICE OF PROCESS

    I hereby certify and return that on _____, 20   , I served a copy of the within summons, together with a copy of the complaint in this action, upon the within-named defendant, in the following manner (see Mass. R. Civ. P. 4 (d) (1-5):

_____

_____

_____

Dated:       , 20  .      _____

N.B.   TO PROCESS SERVER:-
        PLEASE PLACE DATE YOU MAKE SERVICE ON DEFENDANT IN
        THIS BOX ON THE ORIGINAL AND ON COPY SERVED ON DEFENDANT.

_____
|                                |
|                     , 20   .   |
|_____|

COMMONWEALTH OF
MASSACHUSETTS

ESSEX, ss.

SUPERIOR COURT
CIVIL ACTION
No. X77CV 00143

Allied Elevator Group, Inc., et al

Plaintiff(s)

v.

3Phase Elevator Corp.

Defendant(s)

SUMMONS
(Mass. R. Civ. P. 4)

# Commonwealth of Massachusetts

ESSEX, ss

SUPERIOR COURT

Docket Number:

---

Allied Elevator Group Inc. and Ronald
Tremblay,
     Plaintiffs,

v.

3Phase Elevator Corp.,
     Defendant.

---

## COMPLAINT AND JURY DEMAND

## FACTS COMMON TO ALL COUNTS

1. This Complaint is filed with the intent and purpose of seeking compensatory damages for violation of executed Asset Purchase Agreement.

2. The Plaintiff, Allied Elevator Group Inc. (herein referred to as "Allied") is a Massachusetts Corporation with a usual and regular place of business located in Danvers, Essex County, Massachusetts.

3. At all times relevant hereto, Ronald Tremblay (herein referred to as "RT") was President, owner/operator of Allied.

4. The Defendant, 3Phase Elevator Corp. (herein referred to as "3Phase") is a Massachusetts Corporation with a usual and regular place of business located in East Bridgewater, Plymouth County, Massachusetts.

5. The Plaintiff, Allied, at all times relevant hereto, was engaged in the business of repairing, maintaining, inspecting, and servicing of elevator, escalator, keypad and security camera systems until which time it sold its assets to the Defendant as set forth herein.

6. At all times relevant hereto, the Defendant was an elevator maintenance and repair company which purchased all rights, title, and interest in the assets of Allied.

7. At all times relevant hereto and following the sale of the assets of Allied to 3Phase, the Co-Plaintiff, Ronald Tremblay was a statutory employee of 3Phase pursuant to a written contract.

8. That on or about August 2018 the Plaintiff, Allied, and the Defendant, for good and valuable consideration entered into a contract for the sale of the assets of Allied to 3Phase for $3,500,000.00 minus the Holdback Amount and Retention Amount. A copy of the executed Asset Purchase Agreement is attached hereto as Exhibit A.

9. The Holdback Amount was to be paid back to Co-Plaintiff Ronald Tremblay in three installments on the first, second, and third anniversary of the Closing Date so long as Plaintiff was still employed in good standing with Defendant. (Exhibit A)

10. Defendant initiated contact with Co-Plaintiff Ronald Tremblay in an electronic message on or about July 3, 2019 informing Ronald Tremblay he needed to stop driving his personal vehicle and drive a company vehicle. A copy of the electronic message chain is attached hereto as Exhibit B.

11. Co-Plaintiff Ronald Tremblay responded in an electronic message on or about July 8, 2019 that it was known to all parties at the time sale of the assets of Co-Plaintiff's business to Defendant that Co-Plaintiff Ronald Tremblay would be driving a 2017 GMC Denali in his employment for the Defendant. (Exhibit B)

12. On or about July 24, 2019, the Defendant sent an International Union of Elevator Constructors (IUEC) Article XXII Paragraph 5(e) Warning Letter informing Co-Plaintiff Ronald Tremblay that he was in violation of the IUEC Standard Agreement and was no longer in good standing as an employee with Defendant and would be reassigned or terminated unless he started driving a company vehicle. A copy of the Warning Letter is attached hereto as Exhibit C.

13. Co-Plaintiff Ronald Tremblay sent Defendant an electronic message on or about August 1, 2019 informing Defendant that a meeting would be held with union leaders Steve Sears and Steve Bruno and scheduled for August 13, 2019, in order to address the allegations of Co-Plaintiff Ronald Tremblay purportedly violating company rules. (Exhibit B)

14. On or about November 15, 2019, the Defendant sent Co-Plaintiff Ronald Tremblay a Termination Letter citing unsatisfactory work performance and unfounded statements purportedly made by Ronald Tremblay. A copy of the Termination Letter is attached hereto as Exhibit D.

15. Co-Plaintiff Ronald Tremblay sent Defendant a response to the Termination Letter informing Defendant that the unsatisfactory work performance claims were rejected by the IUEC Local 4 business manager, Steve Sears, and the IUEC regional representative, Steve Bruno at the union meeting on August 13, 2019. Additionally, Sears and Bruno suggested that Defendant should pursue any action through arbitration. A copy of Co-Plaintiff RT's Response Letter is attached hereto as Exhibit E.

## COUNT I
### BREACH OF CONTRACT
### Allied Elevator Group Inc. v. 3Phase Elevator Corp.

16. The Co-Plaintiff repeats and reavers the allegations contained in Paragraphs 1 through 15 of the Plaintiffs' Complaint as if expressly rewritten and set forth herein.

17. The Plaintiffs performed as required by the Agreement and remained ready, willing, and able to perform the contract, and to close the transaction in accordance with the terms and conditions of the executed contract.

18. Following the sale and transfer of the Assets of Co-Plaintiff Allied, the Co-Plaintiff Ronald Tremblay continued to perform his post-closing duties and obligations including post-closing employment and servicing of pre-existing clients.

19. The Defendant had a contractual duty and obligation to proceed in good faith.

20. The Defendant did not use good faith and neglected, refused, and abrogated the terms and conditions of the agreed upon contract by disavowing its enforceability and denying its validity.

21. The Defendant, through its actions and conduct since the anniversary payment was due, has wrongfully deprived the Plaintiffs of its interests in the Holdback Funds the Defendant shall pay as indicated in the Asset Purchase Agreement.

22. The Defendant, through its actions and conduct since July 2019, has failed and ignored the requirements of the contract, has failed in exercising good faith and due diligence in facilitating the conveyance of Plaintiffs' Holdback Funds, and has blatantly abrogated and breached the contract as written.

23. As a direct and proximate result of the Defendant's breaches of contract as herein stated, the Plaintiffs have been financially damaged, and the damages incurred were reasonably foreseeable.

24. The damages incurred by the Plaintiffs include consequential and incidental damages.

## COUNT II
### UNJUST ENRICHMENT
### Ronald Tremblay v. 3Phase Elevator Corp.

25. The Co-Plaintiff repeats and reavers the allegations contained in Paragraphs 1 through 24 of the Plaintiffs' Complaint as if expressly rewritten and set forth herein.

26. By their acts and/or omissions herein alleged, Defendant has been unjustly enriched at the expense of the Plaintiff.

27. The Defendant has knowingly received a benefit, including but not limited to keeping Plaintiff's Holdback Funds that should have been disbursed to Plaintiff as stated in the Asset Purchase Agreement.

28. As a direct and proximate result of Defendant's unjust enrichment, Plaintiff is entitled to restitution in an amount to be proven at trial.

## COUNT III
## UNFAIR AND DECEPTIVE BUSINESS PRACTICES
### Ronald Tremblay v. 3Phase Elevator Corp.

29. The Co-Plaintiff repeats and reavers the allegations contained in Paragraphs 1 through 28 of the Plaintiffs' Complaint as if expressly rewritten and set forth herein.

30. The Defendant has engaged in unfair and deceptive business practices under Chapter 93A § 9 of Massachusetts General Laws by wrongfully denying Ronald Tremblay from driving his 2017 GMC Denali in his employment with Defendant as this was known to both parties at the start of Ronald Tremblay's employment.

31. As a direct and proximate result of Defendant's unfair and deceptive business practices, Co-Plaintiff Ronald Tremblay has lost employment wages from not working and had his employment subject to wrongful interference.

## COUNT IV
## WRONGFUL TERMINATION
### Ronald Tremblay v. 3Phase Elevator Corp.

32. The Co-Plaintiff repeats and reavers the allegations contained in Paragraphs 1 through 32 of the Plaintiffs' Complaint as if expressly rewritten and set forth herein.

33. The Defendant, 3Phase wrongly terminated and disciplined Co-Plaintiff, Ronald Tremblay, a statutory employee pursuant to written contract, as a result of Ronald Tremblay driving his 2017 GMC Denali for use during employment, and unfounded statements Ronald Tremblay purportedly made to clients regarding Defendant in an effort to discredit Ronald Tremblay and provide pretense for his wrongful termination.

34. Co-Plaintiff Ronald Tremblay was wrongly terminated and disciplined by Defendant after Co-Plaintiff Ronald Tremblay's union rejected Defendant's claims of unsatisfactory work performance and suggested Defendant to pursue any action through arbitration.

Wherefore, The Plaintiff Demands:

a. Defendant be ordered to specifically perform the terms and obligations of the Asset Purchase Agreement dated August 2018 and to release and pay the funds remaining due under the retention provision.

b. Defendant be ordered to pay to the Plaintiffs' costs of this litigation and counsel fees;

c. Judgment against Defendant in an amount proven at trial, plus interest, costs and attorney fees, and triple damages.

d. Judgment against the Defendant, 3Phase, for injuries actually and proximately caused by wrongful termination including, but not limited to, damages from such wrongful termination, lost wages, humiliation, indignity, emotional harm, interest, costs, attorney fees, and any other such damages as to this court shall deem just and proper.

e. And for such further relief as to this Court shall deem just and proper.

Respectfully submitted,
The Plaintiffs,
By their attorney,

RUSSELL Z. GOLDBERG, Esq.
Falbo, Solari & Goldberg, PC
BBO No. 549953
5 Essex Green Drive
Peabody, MA  01960
978-532-8891

Dated: 5/8/20

# CIVIL ACTION COVER SHEET

2077CV00443A

Commonwealth of Massachusetts
**The Superior Court**

+efile

| PLAINTIFF(S): | Allied Elevator Group, Inc. and Ronald Tremblay | | COUNTY |
|---|---|---|---|
| ADDRESS: | 100 Ferncroft Road, #106 | | Essex |
| | Danvers, MA 01923 | DEFENDANT(S): | 3Phase Elevator Corporation |
| ATTORNEY: | Russell Z. Goldberg, Esquire | | |
| ADDRESS: | 5 Essex Green Drive, Suite 34 | ADDRESS: | 100 Laurel Street, Suite 101 |
| | Peabody, MA 01960 | | East Bridgewater, MA 02333 |
| BBO: | 549953 | | |

## TYPE OF ACTION AND TRACK DESIGNATION (see reverse side)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| BC1 | Mergers, Consolidations, Sales of Assets, Issuance | A | ☐ YES   ☒ NO |

**\*If "Other" please describe:**

Is there a claim under G.L. c. 93A?
☐ YES   ☒ NO

Is this a class action under Mass. R. Civ. P. 23?
☐ YES   ☒ NO

## STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff's counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

### TORT CLAIMS
(attach additional sheets as necessary)

A. Documented medical expenses to date:
1. Total hospital expenses ................................................................................................ $ _____
2. Total doctor expenses .................................................................................................. $ _____
3. Total chiropractic expenses ......................................................................................... $ _____
4. Total physical therapy expenses .................................................................................. $ _____
5. Total other expenses (describe below) ......................................................................... $ _____
                                                                     Subtotal (A): $ _____

B. Documented lost wages and compensation to date ......................................................... $ _____
C. Documented property damages to date .......................................................................... $ _____
D. Reasonably anticipated future medical and hospital expenses ......................................... $ _____
E. Reasonably anticipated lost wages ............................................................................... $ _____
F. Other documented items of damages (describe below) ..................................................... $ _____

G. Briefly describe plaintiff's injury, including the nature and extent of injury:

TOTAL (A-F):$ _____ 0.00

### CONTRACT CLAIMS
(attach additional sheets as necessary)

☐ This action includes a claim involving collection of a debt incurred pursuant to a revolving credit agreement. Mass. R. Civ. P. 8.1(a).
Provide a detailed description of claim(s):

TOTAL: $ 100,000.00

Failure to pay for all assets per contract.

**Signature of Attorney/ Unrepresented Plaintiff: X**                              **Date:**

**RELATED ACTIONS:** Please provide the case number, case name, and county of any related actions pending in the Superior Court.

## CERTIFICATION PURSUANT TO SJC RULE 1:18

I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

**Signature of Attorney of Record: X**                              **Date:** 5/27/20

# CIVIL ACTION COVER SHEET INSTRUCTIONS
## SELECT CATEGORY THAT BEST DESCRIBES YOUR CASE

**AC Actions Involving the State/Municipality \***

| | |
|---|---|
| AA1 Contract Action involving Commonwealth, Municipality, MBTA, etc. | (A) |
| AB1 Tortious Action involving Commonwealth, Municipality, MBTA, etc. | (A) |
| AC1 Real Property Action involving Commonwealth, Municipality, MBTA etc. | (A) |
| AD1 Equity Action involving Commonwealth, Municipality, MBTA, etc. | (A) |
| AE1 Administrative Action involving Commonwealth, Municipality, MBTA, etc. | (A) |

**CN Contract/Business Cases**

| | |
|---|---|
| A01 Services, Labor, and Materials | (F) |
| A02 Goods Sold and Delivered | (F) |
| A03 Commercial Paper | (F) |
| A04 Employment Contract | (F) |
| A05 Consumer Revolving Credit - M.R.C.P. 8.1 | (F) |
| A06 Insurance Contract | (F) |
| A08 Sale or Lease of Real Estate | (F) |
| A12 Construction Dispute | (A) |
| A14 Interpleader | (F) |
| BA1 Governance, Conduct, Internal Affairs of Entities | (A) |
| BA3 Liability of Shareholders, Directors, Officers, Partners, etc. | (A) |
| BB1 Shareholder Derivative | (A) |
| BB2 Securities Transactions | (A) |
| BC1 Mergers, Consolidations, Sales of Assets, Issuance of Debt, Equity, etc. | (A) |
| BD1 Intellectual Property | (A) |
| BD2 Proprietary Information or Trade Secrets | (A) |
| BG1 Financial Institutions/Funds | (A) |
| BH1 Violation of Antitrust or Trade Regulation Laws | (A) |
| A99 Other Contract/Business Action - Specify | (F) |

\* Choose this case type if ANY party is the Commonwealth, a municipality, the MBTA, or any other governmental entity UNLESS your case is a case type listed under Administrative Civil Actions (AA).

† Choose this case type if ANY party is an incarcerated party, UNLESS your case is a case type listed under Administrative Civil Actions (AA) or is a Prisoner Habeas Corpus case (E97).

**ER Equitable Remedies**

| | |
|---|---|
| D01 Specific Performance of a Contract | (A) |
| D02 Reach and Apply | (F) |
| D03 Injunction | (F) |
| D04 Reform/ Cancel Instrument | (F) |
| D05 Equitable Replevin | (F) |
| D06 Contribution or Indemnification | (F) |
| D07 Imposition of a Trust | (A) |
| D08 Minority Shareholder's Suit | (A) |
| D09 Interference in Contractual Relationship | (F) |
| D10 Accounting | (A) |
| D11 Enforcement of Restrictive Covenant | (F) |
| D12 Dissolution of a Partnership | (F) |
| D13 Declaratory Judgment, G.L. c. 231A | (A) |
| D14 Dissolution of a Corporation | (F) |
| D99 Other Equity Action | (F) |

**PA Civil Actions Involving Incarcerated Party †**

| | |
|---|---|
| PA1 Contract Action involving an Incarcerated Party | (A) |
| PB1 Tortious Action involving an Incarcerated Party | (A) |
| PC1 Real Property Action involving an Incarcerated Party | (F) |
| PD1 Equity Action involving an Incarcerated Party | (F) |
| PE1 Administrative Action involving an Incarcerated Party | (F) |

**TR Torts**

| | |
|---|---|
| B03 Motor Vehicle Negligence - Personal Injury/Property Damage | (F) |
| B04 Other Negligence - Personal Injury/Property Damage | (F) |
| B05 Products Liability | (A) |
| B06 Malpractice - Medical | (A) |
| B07 Malpractice - Other | (A) |
| B08 Wrongful Death - Non-medical | (A) |
| B15 Defamation | (A) |
| B19 Asbestos | (A) |
| B20 Personal Injury - Slip & Fall | (F) |
| B21 Environmental | (F) |
| B22 Employment Discrimination | (F) |
| BE1 Fraud, Business Torts, etc. | (A) |
| B99 Other Tortious Action | (F) |

**RP Summary Process (Real Property)**

| | |
|---|---|
| S01 Summary Process - Residential | (X) |
| S02 Summary Process - Commercial/ Non-residential | (F) |

**RP Real Property**

| | |
|---|---|
| C01 Land Taking | (F) |
| C02 Zoning Appeal, G.L. c. 40A | (F) |
| C03 Dispute Concerning Title | (F) |
| C04 Foreclosure of a Mortgage | (X) |
| C05 Condominium Lien & Charges | (X) |
| C99 Other Real Property Action | (F) |

**MC Miscellaneous Civil Actions**

| | |
|---|---|
| E18 Foreign Discovery Proceeding | (X) |
| E97 Prisoner Habeas Corpus | (X) |
| E22 Lottery Assignment, G.L. c. 10, § 28 | (X) |

**AB Abuse/Harassment Prevention**

| | |
|---|---|
| E15 Abuse Prevention Petition, G.L. c. 209A | (X) |
| E21 Protection from Harassment, G.L. c. 258E | (X) |

**AA Administrative Civil Actions**

| | |
|---|---|
| E02 Appeal from Administrative Agency, G.L. c. 30A | (X) |
| E03 Certiorari Action, G.L. c. 249, § 4 | (X) |
| E05 Confirmation of Arbitration Awards | (X) |
| E06 Mass Antitrust Act, G.L. c. 93, § 9 | (A) |
| E07 Mass Antitrust Act, G.L. c. 93, § 8 | (X) |
| E08 Appointment of a Receiver | (X) |
| E09 Construction Surety Bond, G.L. c. 149, §§ 29, 29A | (A) |
| E10 Summary Process Appeal | (X) |
| E11 Worker's Compensation | (X) |
| E16 Auto Surcharge Appeal | (X) |
| E17 Civil Rights Act, G.L. c.12, § 11H | (A) |
| E24 Appeal from District Court Commitment, G.L. c.123, § 9(b) | (X) |
| E25 Pleural Registry (Asbestos cases) | |
| E94 Forfeiture, G.L. c. 265, § 56 | (X) |
| E95 Forfeiture, G.L. c. 94C, § 47 | (F) |
| E99 Other Administrative Action | (X) |
| Z01 Medical Malpractice - Tribunal only, G.L. c. 231, § 60B | (F) |
| Z02 Appeal Bond Denial | (X) |

**SO Sex Offender Review**

| | |
|---|---|
| E12 SDP Commitment, G.L. c. 123A, § 12 | (X) |
| E14 SDP Petition, G.L. c. 123A, § 9(b) | (X) |

**RC Restricted Civil Actions**

| | |
|---|---|
| E19 Sex Offender Registry, G.L. c. 6, § 178M | (X) |
| E27 Minor Seeking Consent, G.L. c.112, § 12S | (X) |

### TRANSFER YOUR SELECTION TO THE FACE SHEET

**EXAMPLE:**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B03 | Motor Vehicle Negligence-Personal Injury | F | ☒ YES  ☐ NO |

## STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

**DUTY OF THE PLAINTIFF -** The plaintiff shall set forth, on the face of the civil action cover sheet (or attach additional sheets as necessary), a statement specifying the facts on which the plaintiff relies to determine money damages. A copy of such civil action cover sheet, including the statement as to the damages, shall be served with the complaint. **A clerk-magistrate shall not accept for filing a complaint, except as otherwise provided by law, unless it is accompanied by such a statement signed by the attorney or self-represented litigant.**

**DUTY OF THE DEFENDANT -** If the defendant believes that the statement of damages filed by the plaintiff is inadequate, the defendant may file with his/her answer a statement specifying the potential damages which may result if the plaintiff prevails.

### A CIVIL COVER SHEET MUST BE FILED WITH EACH COMPLAINT.
### FAILURE TO COMPLETE THIS COVER SHEET THOROUGHLY AND ACCURATELY
### MAY RESULT IN DISMISSAL OF THIS ACTION.

| CIVIL TRACKING ORDER<br>(STANDING ORDER 1- 88) | DOCKET NUMBER<br>2077CV00443 | Trial Court of Massachusetts<br>The Superior Court |
|---|---|---|

| CASE NAME:<br>Allied Elevator Group, Inc. et al vs. 3Phase Elevator Corp. | Thomas H. Driscoll, Jr., Clerk of Courts |
|---|---|

| TO: Russell Zane Goldberg, Esq.<br>Falbo Solari & Goldberg<br>5 Essex Green Drive<br>Suite 34<br>Peabody, MA 01960 | COURT NAME & ADDRESS<br>Essex County Superior Court - Salem<br>J. Michael Ruane Judicial Center<br>56 Federal Street<br>Salem, MA 01970 |
|---|---|

## TRACKING ORDER - A - Average

You are hereby notified that this case is on the track referenced above as per Superior Court Standing Order 1-88. The order requires that the various stages of litigation described below must be completed not later than the deadlines indicated.

### STAGES OF LITIGATION                                    DEADLINE

|  | SERVED BY | FILED BY | HEARD BY |
|---|---|---|---|
| Service of process made and return filed with the Court |  | 08/10/2020 |  |
| Response to the complaint filed (also see MRCP 12) |  | 09/08/2020 |  |
| All motions under MRCP 12, 19, and 20 | 09/08/2020 | 10/08/2020 | 11/09/2020 |
| All motions under MRCP 15 | 07/05/2021 | 08/04/2021 | 08/04/2021 |
| All discovery requests **and depositions** served and non-expert depositions completed | 05/02/2022 |  |  |
| All motions under MRCP 56 | 05/31/2022 | 06/30/2022 |  |
| Final pre-trial conference held and/or firm trial date set |  |  | 10/28/2022 |
| Case shall be resolved and judgment shall issue by |  |  | 05/11/2023 |

**The final pre-trial deadline is <u>not the scheduled date of the conference</u>.** You will be notified of that date at a later time.

**Counsel for plaintiff must serve this tracking order on defendant before the deadline for filing return of service.**

This case is assigned to Civil "A" Session at the Salem Superior Court, 56 Federal Street, Salem, MA 01970.

| DATE ISSUED<br>05/12/2020 | ASSISTANT CLERK<br>Carlotta Patten | PHONE<br>(978)825-4800 |
|---|---|---|

Date/Time Printed: 05-12-2020 10:08:24

SCV026\ 08/2018

**From:** Michael Strachan <mike@3phaseelevator.com>
**Date:** July 3, 2019 at 12:05:55 PM EDT
**To:** Ron Tremblay <Rtremblay@3phaseelevator.com>
**Cc:** Frank Strachan <fstrachan@3phaseelevator.com>, Don MacKenzie <dmackenzie@3phaseelevator.com>
**Subject: Company vehicle**

Hi Ron,

I hope your vacation is going great.  As you know a few months ago we spoke about having all of our service employees in company vehicles.  This is important for a few reasons.  One we want to have our vehicles stocked with proper parts to support our customer base.  We want our customers to be able to identify our technicians when arriving at a location, and allows 3Phase to have a uniform approach to servicing our customer base.  We have told our insurance company that all service employees are in company vehicles.  In addition, having GPS on our vehicles will allow us to better serve our customers with calls, shutdowns and response times.  All of our service employees have a company vehicle with GPS installed.

Finally, the cost for a "one" off vehicle far exceeds any other cost we have and therefore we need to provide you a company vehicle like all our other adjusters and service employees currently are using.  I hope you will find this acceptable and understand we are trying to get a uniform approach for our service business.

Lets me know what day next week we can get you this company vehicle.

Thank you

Mike...

Michael Strachan
CEO

<image002.jpg>

100 Laurel Street, Suite 102, East Bridgewater Ma. 02333
**Cell**- 617-894-2689

*ß*

Hi Ron,

This is just a follow up to our conversation that we had yesterday.  Before I begin, I want to reiterate that you are a valued employee and we understand that you are extremely talented and we hope that you decide to stay. working with 3Phase

As you can imagine, as we scale our business, we need to ensure our service business is uniform and consistent across the service business.  Every route mechanic and service adjuster drive a company vehicle and that company vehicle is equipped with GPS.  We want our service technicians to be easily identifiable and we need our service mechanics and adjusters to have spare parts in their vans in order to support our customer base.

So, in order for you to stay in our service business as a "service adjuster" and receive the current above scale rate you receive, we will need you in a 3Phase vehicle that will be equipped with GPS.

If you do not want a company vehicle, we want to offer you a reassignment in Modernization (working for Jimmy Venza) as a modernization mechanic.  We realize that you are a talented mechanic but we would not be utilizing you as a modernization adjuster so we can only offer this position to you at 6 % above scale.

We hope you decide to stay with 3Phase.

Br,

Mike...


Michael Strachan
CEO

**From:** Ron Tremblay <Rtremblay@3phaseelevator.com>
**Date:** July 8, 2019 at 5:49:45 PM EDT
**To:** Michael Strachan <mike@3phaseelevator.com>
**Subject: Re: Company vehicle**

Hi Mike,

At the point of sale of Allied Elevator in the purchase agreement,  it was known to all parties that I was keeping from the asset purchase agreement the 2017 GMC Denali as the vehicle that I would be driving for 3 Phase Elevator company. We also discussed that they would be covering  my expenses and have been doing so for the last 11 months.  As we talked about a couple months ago, I am not interested in driving a 3 Phase company vehicle and do not have any plans to do so although I do appreciate your generous offer.

At this  point, I looked into the asset purchase agreement for my employment with 3 Phase elevator and found no mention of me driving a  3 Phase vehicle.

As a former company owner, I realize that it is not a requirement but a convenience to offer to employees a company vehicle, and it is up to the individual employee to accept that offer or not.  I had multiple employees that did not have company vehicles.

Thank you, Ron

Sent from my iPhone

On Jul 10, 2019, at 2:39 PM, Michael Strachan <mike@3phaseelevator.com> wrote:

Hi Ron,

I don't know what was in the purchase agreement.  If there is something that specifically stated we need to accommodate that then I only ask you share that with me.  All of our adjusters and route mechanics in service have company vehicles.  As I stated before, we need to know where are employees are in case of entrapments, we want our customers to identify our staff when in their buildings and we can't validate the extraordinary cost for a "one" off vehicle.

In addition, we had a major issue today where I was contacted by our customer on a call at 185 Dartmouth street and told Mena to get you to go directly there. She found out two hours later that you decided to go to Simmons college first.  I understand there can be communication issues, but if we had you in our company vehicle that is equipped with GPS, we would have known there was a communication issue and would have redirected you to 185 Dartmouth as that was a priority.

Ron, we are honestly not trying to be difficult.  We need this for our business to function efficiently and effectively and therefore, we are requiring you to drive a company vehicle.  This is a condition of employment for our service adjuster and route mechanics.

We would like to have our company vehicle to you by Monday.

Thank you

Mike..

Michael Strachan
CEO

<image002.jpg>

100 Laurel Street, Suite 102, East Bridgewater Ma. 02333
Cell- 617-894-2689

**From:** Ron Tremblay <Rtremblay@3phaseelevator.com>
**Date:** July 10, 2019 at 3:35:22 PM EDT
**To:** Michael Strachan <mike@3phaseelevator.com>
**Subject: Re: Company vehicle**

Hi Mike,
if Mena had told me to go directly there I would have, I took every call today as they came in if I was directed to do something different I would've and I feel strongly about the company truck so I do understand if you need to let me go as an employee that will have to be a choice you need to make I doubt I will have a problem finding a job if I want and continue driving my personal truck.

Thank you Ron
Sent from my iPhone

**From:** Michael Strachan <mike@3phaseelevator.com>
**Sent:** Thursday, July 11, 2019 5:02 PM
**To:** Ron Tremblay <Rtremblay@3phaseelevator.com>
**Cc:** Michael Strachan <mike@3phaseelevator.com>
**Subject:** Re: Company vehicle

Hi Ron

I definitely realize that there was a miscommunication and I totally understand that it could have been how the calls were given to you. I know how valuable you are in this business. There aren't many techs that are as smart and talented as you and we are grateful to have you. That said, we need to service our customers and we need a consistent and transparent approach. As I stated before, this has nothing to do with you personally. This has to do with us servicing our customers; allowing our customers to be able to identify our techs and the cost of your personal vehicle far exceeds anything reasonable.

We have to have all of our service adjusters and service employees in company vehicles and there can be no exceptions. We are getting considerably larger in scope and we need to have a standard approach to our service business.

I hope you don't want to leave 3Phase, but the vehicle for our service employees is a condition of employment.

We would like you in the company vehicle no later than Monday or Tuesday of next week.

Thanks Ron,

Mike..

Sent from my iPhone

On Jul 15, 2019, at 2:42 PM, Michael Strachan <mike@3phaseelevator.com> wrote:

Hi Ron,

I just want to follow up with getting together to get you in a company vehicle. I want to reiterate that this is just a company policy that we want all of our service adjusters and route personnel in company vehicles. We strongly feel this allows us to better serve our customers.

We would like to make this happen sooner than later.

Thank you, Ron,

Mike..

Michael Strachan
CEO

**From:** Ron Tremblay <Rtremblay@3phaseelevator.com>
**Sent:** Monday, July 15, 2019 3:39 PM
**To:** Michael Strachan <mike@3phaseelevator.com>
**Subject:** Re: Company vehicle

Good afternoon Mike,
if you like to set up to a meeting to have a conversation regarding this matter of the company vehicle I would be more than happy to sit down with you but ultimately my position on this matter has not changed.
 Thank you in advance for your understanding.

Thank you Ron
Sent from my iPhone


**From:** Michael Strachan
**Sent:** Monday, July 15, 2019 4:01 PM
**To:** Ron Tremblay <Rtremblay@3phaseelevator.com>
**Subject:** RE: Company vehicle

Yes, no problem, I will try you tomorrow to talk.

Thanks Ron,

Mike..

Michael Strachan
CEO


**From:** Michael Strachan <mike@3phaseelevator.com>
**Date:** July 18, 2019 at 4:14:10 PM EDT
**To:** Ron Tremblay <Rtremblay@3phaseelevator.com>
**Cc:** Michael Strachan <mike@3phaseelevator.com>
**Subject: RE: Company vehicle**

**From:** Ron Tremblay <Rtremblay@3phaseelevator.com>
**Date:** July 21, 2019 at 12:54:36 PM EDT
**To:** "ron@rtptllc.com" <ron@rtptllc.com>
**Subject:** Employee status

Good Morning Mike,

During the process of negotiations and sale of Allied Elevator it was known to all parties that I was keeping the 2017 GMC Denali out of the sale to use as my personal vehicle for work, that I would be reimbursed for my travel expenses while employed as a Service Adjuster for 3 Phase Elevator, and that I would be earning a plus rate scale of pay.  As evidence of this understanding, you have set a precedence and paid me as such for the past 11 plus months. In addition, when I reviewed our Asset Purchase Agreement,  there was no mention whatsoever of my required use of a Company vehicle as an ongoing employment condition in my current position as a Service Adjuster earning a plus rate scale of pay.

During negotiations if it had been disclosed that I would be required to drive a company vehicle with GPS and/or go into a modernization position as a regular mechanic, the negotiations of the business sale would not have progressed beyond that point and I would not have sold my company to 3 Phase Elevator.

Additionally, I specifically recall requesting that additional language be added in Article 4.5(b) specifying that as an employee of 3 Phase Elevator, I would only be required to adhere to a "commercially reasonable (employment) standard." Such a standard does not require me to drive a company vehicle.

I cannot see any basis for a requirement that I undertake any position other than the Service Adjuster role that was agreed upon at the time of the sale of my business.  As long as I continue to work diligently and effectively in this position,  I would suggest that I am in full compliance with our agreement and performing at a high level for 3 Phase Elevator.  You yourself mentioned in your previous email, '...you are a valued employee and we understand that you are extremely talented.' So I have to ask myself why you would want to take me out of a position that I do so well.  The only thing I can think of is that you are trying to drive me out of my position with 3 Phase Elevator for financial reasons to avoid paying the $100,000 a year hold back that would be coming to me at the end of each of the years 2019,2020 and 2021. I am sure others would agree with my thoughts that this was a corporate decision which was financially driven.

I am aware that you have the right to reassign me to a different position as a mechanic in the industry but at this point at 56 years old I am not looking to do a manually intensive job for 3 Phase or any other elevator company.  Over the years I have worked hard to become an accomplished technician and the industry standard role for me has been Service Adjuster for the last 30+ years.

So at this point please let me know when you do not have any work for me as a Service Adjuster doing the job I was hired to do at the time of sale of Allied Elevator.

Thank you Ron

Sent from my iPhone

**From:** Michael Strachan <mike@3phaseelevator.com>
**Date:** July 24, 2019 at 2:11:11 PM EDT
**To:** Ron Tremblay <Rtremblay@3phaseelevator.com>, Ron Tremblay <Rtremblay@3phaseelevator.com>
**Cc:** "ssears@iueclocal4.com" <ssears@iueclocal4.com>, Michael Strachan <mike@3phaseelevator.com>
**Subject: RT**

Hi Ron,

Please see the attached letter with regards to our recent discussion regarding company vehicle and work assignments.

Please call me to discuss.

Thanks,

Mike..

Michael Strachan
CEO



Dear Ron:

This notice shall constitute a formal written warning to you pursuant to Article XXII, Para. 5 (e) of the Elevator Contractors of America Agreement with International Union of Elevator Constructors running from July 9, 2017 to July 8, 2022 ("CBA").

As you know, on multiple occasions over the past several months, we have reminded you that all service employees (including yourself) must drive company vehicles while on the job. This is a standard 3Phase ("3Phase" or "Company") rule and is important for multiple reasons. First and foremost, we are a customer service business. As such, we want to have our vehicles stocked with the proper parts to support our customer base. The Company also wants to ensure that our customers can identify our service technicians when they arrive at a location and that we generally have a uniform approach to servicing customers. Additionally, as you know, there is a long-standing practice that elevator companies require service employees to drive company vehicles. Finally, the Company's GPS system installed on Company vehicles allows us to better service our customers with calls, shutdowns, and response times. In short, this rule is reasonable and clearly driven by important business considerations. We expect that each 3Phase service employee—including yourself—will abide by the rule.

We are aware that you have unfortunately chosen not to drive a company vehicle and instead drive your personal vehicles while on the job and working as a service employee. We have repeatedly told you that this decision is in direct violation of the Company's rule that all <u>service</u> employees must drive a company vehicle.

Let us be clear: by driving your personal vehicles while on the job and working as a service employee, you are violating an important Company rule applicable to all of our service employees. As such, you have two options: (1) to remain a service employee, you must begin driving a 3Phase company vehicle equipped with GPS no later than Monday July 29, 2019; or (2) you will be reassigned as a modernization mechanic working for Jimmy Venza effective Monday July 29, 2019, at a position that is 6% above scale.

As for your contentions in your email with respect to the Purchase Agreement by and among you and your former company, Allied Elevator Group, Inc., and 3Phase, dated as of August 22, 2018 ("<u>Purchase Agreement</u>"), you are mistaken on each count. First, although you are correct that your "personal vehicles" (namely your 2017 GMC Denali and your 2016 Honda Accord) were specifically excluded from the assets transferred pursuant to the Purchase Agreement (see Section 2.2(c) and Schedule 2.2(c)), it was not "known to all parties" at the time of the sale that you would be using your personal vehicles for work in your capacity as a service employee. The Company <u>denies</u> that there was ever such an understanding at the time of the sale. Moreover, even if there was an oral understanding to that effect (which the Company strongly denies), there is nothing in the written Purchase Agreement to that effect. Ultimately, the written Purchase

Agreement controls in this situation. Section 10.4 of the Purchase Agreement makes clear that the Purchase Agreement itself "constitutes the entire agreement among the parties hereto" and "supersedes all prior understandings of the parties." Additionally, the Company did not accept this alleged "oral" term simply by employing you for the past 11 months. As you know, we have had multiple conversations about this issue over that time frame, and the Company has consistently objected to your use of a personal vehicle for company work as a service employee. You cannot seriously contend that we were acquiescing this entire time to your position. Finally, the complete reading of Section 4.5 (b) of the Purchase Agreement requires you to be "employed by, and in good standing based on a[n] objective commercial standard for the industry . . . ." We have made clear for the reasons set forth above and in prior communications with you that in order to remain in good standing with the Company as a service employee you must drive the company vehicle. Requiring a service employee to simply drive a company vehicle clearly meets the objective commercial standard.

Thus, in order to remain in good standing with the Company, you have two options: (1) to remain a service employee, you must begin driving a 3Phase company vehicle equipped with GPS no later than Monday July 29, 2019; or (2) you will be reassigned as a modernization mechanic working for Jimmy Venza effective Monday, July 29, 2019, at a position that is 6% above scale.

If you refuse to use a company vehicle as a service employee and you reject the offer of working in modernization, your actions can be grounds for further disciplinary action, up to and including termination.

As a final point, the Company also adamantly denies that the enforcement of the rule discussed herein has anything to do with "avoiding payment" of the Retention Amount. equally to all service employees. The Company will fulfill all of its promises and obligations contained in the Purchase Agreement that are owed to you. We simply expect you to do the same.

Please let me know if you have any further questions or would like to discuss.


Sincerely,

Michael Strachan

Michael Strachan




CC:     Steve Sears- IUEC local 4



November 15, 2019

Dear Ron:

This notice shall serve as written notice to you that 3Phase ("3Phase" or "Company") is terminating your employment effective November 15th, 2019.

As you know, you were previously notified about your unsatisfactory work performance in a written warning dated July 24, 2019, pursuant to Article XXII, Para. 5 (e) of the Elevator Contractors of America Agreement with International Union of Elevator Constructors running from July 9, 2017 to July 8, 2022 ("CBA").

Since that time, we have been made aware of several additional instances of workplace misconduct or breaches of Company and industry protocols.   For instance, we have evidence that you have put in for time and payment on jobs where you did not complete any work.   As you know from your many years of experience in the industry, "theft of time" is a serious form of workplace misconduct under the CBA and leads to termination when discovered.   It is on record, through a formal complaint that you bullied and treated another 3Phase employee unprofessionally.   Combined with your prior warning, this type of workplace conduct is unacceptable and constitutes just cause for termination.

Additionally, we have evidence that you disparaged the Company with our customers, and told at least one existing customer to hire another elevator company.  This is in breach of Section 8.6 of the Asset Purchase Agreement between Allied Elevator Group, Inc. and 3Phase Elevator Corp dated August 22, 2018.

We also want to remind you of your continued legal obligation to 3Phase and its employees, including but not limited to non-disparagement.  If this behavior continues or you breach these covenants after your employment is terminated, we will use every avenue possible to protect 3Phase and its employees.

As per Massachusetts state law, along with this letter, we are providing you with your final wage payment due for work through today and payment for any accrued but unused vacation.

Please let me know if you have any further questions.

Michael Strachan-CEO

CC:      Local Union Business Representative



## How long does it take to process a new claim?

It takes approximately three to four weeks to process a new claim. If you are determined to be eligible for UI benefits, you will receive payments for the weeks that you are eligible, except for the first week, which is a waiting period required by Massachusetts Law.

## How to request your weekly benefit payment:

Beginning on the Sunday after you apply for benefits, you must request your benefit payment (sign or certify your eligibility for UI benefits) weekly. A payment will be made to you for the previous week, after you request the benefit payment and we have determined that you are eligible. To request benefit payment:

1. Go to www.mass.gov/dua, select **UI Online for Claimants**. Then log in to your account using your SSN and password that you created. Select **Request Benefit Payment** and answer the questions.

2. Call the automated TeleCert service at 617-626-6338. Follow the voice prompts and answer the questions using the keypad on your phone. TeleCert is available in English and Spanish.

## How to apply for benefits from out of state:

If you worked in Massachusetts and have moved to another state, you may still be eligible for benefits. This type of claim is known as an interstate claim. Interstate claims are subject to Massachusetts Law as if you were still living in the Commonwealth. You can apply for your interstate unemployment claim using UI Online or by calling the TeleClaim Center.

## Need help?

If you have any questions concerning your eligibility or need assistance applying for unemployment benefits, please review the frequently asked questions on our website, www.mass.gov/dua or call the TeleClaim Center.



THE COMMONWEALTH OF MASSACHUSETTS
EXECUTIVE OFFICE OF LABOR AND WORKFORCE DEVELOPMENT
DEPARTMENT OF UNEMPLOYMENT ASSISTANCE

### Equal Opportunity Employer Program

Auxiliary aids and services are available upon request to individuals with disabilities. For hearing-impaired relay services, call 711

www.mass.gov/dua

Form 0590-A Rev. 6-13

---

This pamphlet includes important information on how to apply for Unemployment Insurance benefits.

Este folleto contiene información importante sobre cómo solicitar los beneficios del Seguro de Desempleo.

Este panfleto contém informações importantes sobre como registrar-se para receber benefícios de subsídio de desemprego.

Данный проспект содержит важную информацию о процессе подачи заявления на получение Страхового пособия по безработице.

Livè sa gen enfòmasyon enpòtan sou fason pou aplike pou Benefis Asirans Chomaj yo.

Il presente opuscolo contiene importanti informazioni riguardanti la modalità di richiesta per l'indennità di disoccupazione.

Cette brochure comporte d'importants renseignements sur la façon de demander des prestations d'assurance-chômage.

 សៀវភៅនេះមានផ្ទុកព័ត៌មានសំខាន់ៗអំពីវិធី និង សំណើសុំប្រាក់ឧបត្ថម្ភសម្រាប់ការគ្មានការងារធ្វើ

ແຜ່ນພັບນີ້ມີຂໍ້ມູນທີ່ສຳຄັນກ່ຽວກັບວິທີສະໝັກເພື່ອເອົາຜົນປະໂຫຍດການປະກັນການຫວ່າງງານ

Cuốn sách mỏng này bao gồm thông tin quan trọng về cách nộp đơn xin bảo hiểm thất nghiệp

이 팸플릿에는 실업 보험 혜택 신청 방법에 대한 중요한 정보가 들어 있습니다.

يتضمّن هذا الكتيّب معلومات مهمة عن كيفية التقدّم للحصول على مزايا تأمين البطالة.

---

### To Massachusetts Workers:

# How to Apply for Unemployment Insurance Benefits

THE COMMONWEALTH OF MASSACHUSETTS
EXECUTIVE OFFICE OF LABOR AND WORKFORCE DEVELOPMENT
DEPARTMENT OF UNEMPLOYMENT ASSISTANCE

### To Massachusetts Employers:

Under the state's Employment and Training Law, you are required to give a copy of this pamphlet to each of your employees who is separated from work, permanently or temporarily. Please complete the information below:

Employer Name

DUA Employer Account Number (EAN)

Federal Employer ID Number (optional)

Address (to which DUA should mail request for separation and wage information)

## What is Unemployment Insurance?

Unemployment Insurance (UI) is a temporary income protection program for workers who have lost their jobs through no fault of their own, but are able to work, available for work, and looking for work. Funding for UI benefits comes from quarterly contributions paid by the state's employers to the Department of Unemployment Assistance (DUA); no deductions are made from employees' pay.

## When should you apply for UI benefits?

If you have been separated from work, or your work schedule has been reduced, you should apply for UI benefits during your first week of total or partial unemployment. Your claim will begin on the Sunday of the calendar week in which your claim is filed. This date is known as your effective claim date. Waiting more than a full week to request benefits will delay the beginning of your claim and benefits may not be paid for the week(s) of unemployment that occurred prior to the week of filing.

## How to apply for UI benefits:

We are committed to providing you with prompt and courteous service. Our goal is to ensure that you can apply for benefits quickly and efficiently. Simply follow these steps:

### Be ready with the following information:

- Social Security Number
- Date of birth (month, day, year)
- Home address, telephone number, and email address (if available)
- Whether you have filed a UI claim in Massachusetts, or in any other state during the past 12 months
- The names and addresses of all employers you have worked for during the past 15 months, and the dates you worked for each employer. If you are reopening a claim, be prepared to provide the same information for any employment you have had since your claim was last active
- Your Military discharge papers – form DD-214, member 4 (if you were separated from Military service with any branch of the U.S. armed forces within the past 18 months)
- If you were employed by the federal government within the past 18 months, the SF-8 and SF-50 form given to you by your government employer at the time of your separation
- The reason why you are no longer working or why your hours have been reduced

Form 0590-A Rev. 6-13

---

- Last day of employment
- The names, dates of birth, and Social Security Numbers of any dependent children that you plan to claim as a dependent
- Alien registration number or verification that you were legally eligible to work in the United States, and that you are currently eligible to begin a new job

## Select the method that is most convenient for you:

There are two ways you can apply for benefits.



## Apply using UI Online:

UI Online is a safe, secure, easy-to-use, self-service system. If you choose to use UI Online for the first time, you will complete the information online and submit your application using a computer with Internet access. If you do not have access to a computer, visit your local library or One-Stop Career Center to use free, publicly-available computers.

To apply using UI Online (5:00 a.m. to 10:00 p.m. daily):

1. Go to www.mass.gov/dua and select **UI Online for Claimants.**

2. Then select **Apply for Benefits.** When you apply for benefits using UI Online for the first time, you will be asked to enter your Social Security Number (SSN), create a password, and select a security question and answer. It is important for you to remember your password and security question and answer. You will use your SSN and password to access UI Online each week to request your benefit payment. If you forget your password, you can reset it by clicking **Forgot Password**, answering the security question, and selecting a new password.

3. Complete all information requested. You will receive a confirmation message after you submit your application. If your application is interrupted, you can go back and complete it before 10:00 p.m. on Saturday of the same week.

**Tip:** Be sure to provide your telephone number and email address – it will make it easier for us to contact you if there are questions about your application.

---

## Apply by phone using the TeleClaim Center:

To apply for benefits by phone (8:30 a.m. to 4:30 p.m. Monday through Friday):

1. Call the TeleClaim Center toll-free at 877-626-6800; from area codes 351, 413, 508, 774, and 978; or 617-626-6800 from any other area code.

2. Select English or another language.

3. Press 1 – to apply for benefits. Enter your SSN and the year you were born. You will then be connected to an agent who will take the information necessary to file your claim.

**Note:** During peak periods from Monday through Thursday, call scheduling may be implemented providing priority for callers based on the last digit of their Social Security number. This helps ensure that everyone can get through to the TeleClaim Center in a timely manner. Please check the schedule below before calling:

| If the last digit of your SSN is: | Assigned day to call TeleClaim is: |
|---|---|
| 0, 1 | Monday |
| 2, 3 | Tuesday |
| 4, 5, 6 | Wednesday |
| 7, 8, 9 | Thursday |
| Any last digit | Friday |

## How to create or change your Personal Identification Number (PIN) for TeleCert:

When you apply for benefits by telephone for the first time, you will be asked to create your PIN. If you have previously created your PIN and do not remember it, or need to change your PIN, call the PIN Service Line at 617-626-6943. The PIN Service Line is available seven days a week from 5 a.m. to 10 p.m. You will need a touch-tone phone to use the PIN Service Line. Note: Please be aware that smart phones with QWERTY keyboard sometimes do not work when answering the security question. Instead, use a cellular phone or land line.



From: Ron Tremblay <                                    >
Sent: Thursday, August 1, 2019 11:24 AM
To: Michael Strachan <                          >
Subject: Meeting request

Mike,
After reading your letter, I think you were ill-advised when you wrote me a formal written warning letter.

The letter that you wrote is to initiate the termination process and refers to unsatisfactory performance per article XXII pp. 5 of our IEUC Standard Agreement. I think you must be seriously confused, and I really do not think you can use this article for the purpose of Termination because in a recent letter you mentioned what a valuable employee I was. In fact, it seems you are looking to terminate me because I am not interested in driving a company vehicle although it is not required per the union standard agreement. In addition, the fact that you're asking me to transfer to the modernization department is a direct result of my not wanting to drive a company vehicle.

I have requested a meeting with our business manager Steve Sears, myself and the IUEC Regional representative on this matter. The date has been set for August 13. Until such time I think it would be smart to hold off on any position changes for me in the company until we get clarification on these issues for me.

Let me know how you would like to proceed.

Thank you Ron
Sent from my iPhone

From: Michael Strachan <                          >
Date: August 4, 2019 at 9:45:20 AM EDT
To: Ron Tremblay <                          >
Cc: Michael Strachan <                    >
Subject: RE: Meeting request

Hi Ron,

Thank you for your note.

Regardless of whether you are a valuable employee, the Company needs you to follow its rules or else you could expose yourself to the consequences for not following company policies.

We will meet with you and the Union on August 13th and we can discuss this more at that time. This brief delay however shall not be construed as a waiver of any of our rights under the collective bargaining agreement, including the right to take future action against you should you fail to follow the rules.

Thanks,
Mike

In response to the termination letter from Mike Stratton at 3Phase elevator.

Mike, I feel that you are off-base and misguided in your thoughts that your previous warning letter you wrote in July 24, 2019 has anything to do with the termination notice delivered to me on November 15, 2019. In case you forgot the letter you wrote for unsatisfactory work performance in July was not accepted by local 4,s business Manager Steve Sears and the international Unions regional representative Steve Bruno and at the outcome of the meeting they suggested that if you wanted to pursue the actions of the letter you were told to bring it to arbitration.

I'm sure if you thought it had any merit you would've brought it to arbitration and obviously you did not understand our standard agreement expense paragraph which is why you did not pursue the action of the letter.

I do realize that you are probably upset that you are unable to penalize me for not driving a company vehicle and not getting your way but I do not understand why you are making up stories of me threatening fellow employees and also thievery of time which I would like to address those issues.

1. Threatening.
   I have never threatened any 3Phase employee for you to say that is a serious lack of moral judgment on your part to try and get your way on terminating me.
   I am at a good point in my life and do not take anything to heart and do not get upset.
   I did have a conversation with the dispatcher Mena and also the same conversation Frank Stratton explaining my thoughts on sending me from the North Shore of Boston to West Bridgewater during traffic hour and questioning how 3Phase elevator can make any money with me sitting in traffic for an extended period of time when they had other 3Phase employees who live on the South Shore in that general area commuting to the opposite direction so I did question the lack of managerial skills the company possesses but never did I raise my voice or use any vulgar language and certainly would never threaten any of my peers in the workplace.

2. Theft of time.
   I do not understand how you can suggest a theft of time.  When 3Phase elevator company purchased Allied elevator I was told I would be guaranteed 40 hours a week at a 25% over the scale rate so if I am missing any working hours I find that to be acceptable and if you do not you should've brought this to my attention prior to terminating me and told me that my guaranteed 40 hours was no longer on the table. Also, if any jobs on your lift keeper time summary App had any time that you did not agree with I suggest you should've brought it to my attention. Also, if a job did not get completed it is possible we did not have the right parts and work should've continued when the proper parts were ordered. I often find that It is common that proper parts are not ordered because there is a serious lack of elevator knowledge in the office.
   And if that is the case I do not know what jobs you are talking about but I do know that the office changes a lot of the information input on lift keeper by our technicians.  I have seen it firsthand so with that being said lift keeper is not a true validation of my work or time because I

know it often gets manipulated in the office sometimes to satisfy the customer's maintenance needs or balance job quotas or in this case to penalize me.

3. Suggestion of me recommending 3Phase existing customers to hire another elevator company.
   I am sure you can find somebody that you can coerce into making such a statement, as you must have done related to the claim I threatened a fellow employee.  But it would just show another lack of moral judgment on your part to try to wrongfully terminate me in order to avoid payment of the retention amount due to me on December 31 and following 2 years to come.

   I feel that I am being harassed unjustifiably in my workplace at 3Phase Elevator and if this does not stop I will be seeking legal advice.


Thank you,
Ron Tremblay
978-833-2614

ASSET PURCHASE AGREEMENT

by and among

ALLIED ELEVATOR GROUP INC.,

3 PHASE ELEVATOR CORP.

and

RONALD S. TREMBLAY

Dated as of August 22, 2018

# TABLE OF CONTENTS

Page

**ARTICLE 1: DEFINITIONS** ........................................................................................................... 1
    1.1    Definitions and Defined Terms ........................................................................... 1

**ARTICLE 2: PURCHASE AND SALE** ......................................................................................... 1
    2.1    Assets to be Transferred ....................................................................................... 1
    2.2    Retained Assets ..................................................................................................... 2

**ARTICLE 3: LIABILITIES** ............................................................................................................ 2
    3.1    Assumed Liabilities .............................................................................................. 2
    3.2    Retained Liabilities .............................................................................................. 2

**ARTICLE 4: PURCHASE PRICE** ................................................................................................ 3
    4.1    Purchase Price ....................................................................................................... 3
    4.2    Closing Date Adjustments .................................................................................... 3
    4.3    Post-Closing Determinations ............................................................................... 3
    4.4    Post-Closing Adjustments .................................................................................... 4
    4.5    Release of the Holdback Amount and the Retention Amount .............................. 4
    4.6    Allocation of Purchase Price ................................................................................ 4

**ARTICLE 5: CLOSING** ................................................................................................................. 4
    5.1    Closing .................................................................................................................. 4
    5.2    Deliveries by the Seller Group ............................................................................ 4
    5.3    Deliveries by Purchaser........................................................................................ 5

**ARTICLE 6: REPRESENTATIONS AND WARRANTIES OF THE SELLER GROUP** ................ 5
    6.1    Existence and Good Standing ............................................................................... 5
    6.2    Power; Enforceability........................................................................................... 5
    6.3    Purchased Assets .................................................................................................. 6
    6.4    Financial Information ........................................................................................... 7
    6.5    Personnel .............................................................................................................. 7
    6.6    Intellectual Property ............................................................................................. 8
    6.7    Litigation .............................................................................................................. 8
    6.8    Taxes .................................................................................................................... 9
    6.9    Consents ............................................................................................................... 9
    6.10    Brokers ................................................................................................................. 9

**ARTICLE 7: REPRESENTATIONS AND WARRANTIES OF PURCHASER** ............................ 9
    7.1    Existence and Good Standing ............................................................................... 9
    7.2    Power; Enforceability........................................................................................... 9
    7.3    Brokers ................................................................................................................. 9

**ARTICLE 8: COVENANTS AND AGREEMENTS** ..................................................................... 9
    8.1    Further Assurances................................................................................................ 9
    8.2    Transfer Taxes...................................................................................................... 10
    8.3    Accounts Receivable ............................................................................................ 10
    8.4    Confidential Information....................................................................................... 10
    8.5    Noncompetition.................................................................................................... 10

## TABLE OF CONTENTS (CONT'D)

Page

| | | |
|---|---|---:|
| 8.6 | Nonsolicitation | 11 |
| 8.7 | Additional Customer Proposals | 11 |
| 8.8 | Additional Acknowledgements | 11 |
| 8.9 | Use of Business Name | 12 |
| 8.10 | Required Withholding | 12 |

**ARTICLE 9: REMEDIES** .................................................................................................. **12**

| | | |
|---|---|---:|
| 9.1 | General Indemnification Obligation | 12 |
| 9.2 | Notice and Opportunity to Defend | 13 |

**ARTICLE 10: MISCELLANEOUS** ..................................................................................... **14**

| | | |
|---|---|---:|
| 10.1 | Press Release and Announcements | 14 |
| 10.2 | Expenses | 14 |
| 10.3 | No Assignment | 14 |
| 10.4 | Integration, Modification and Waiver | 14 |
| 10.5 | Construction | 14 |
| 10.6 | Severability | 14 |
| 10.7 | Notices | 15 |
| 10.8 | Governing Law; Consent to Jurisdiction | 16 |
| 10.9 | WAIVER OF JURY TRIAL | 16 |
| 10.10 | Specific Performance | 17 |
| 10.11 | Counterparts | 17 |

## ASSET PURCHASE AGREEMENT

THIS PURCHASE AGREEMENT (this "*Agreement*"), dated as of this 22nd day of August, 2018 (the "*Closing Date*"), by and among 3 Phase Elevator Corp., a Massachusetts corporation ("*Purchaser*"), Allied Elevator Group Inc., a Massachusetts corporation ("*Seller*"), and Ronald S. Tremblay (the "*Owner*" and together with Seller, the "*Seller Group*").

A.      Seller, owns, operates and is engaged in the business of repairing, maintaining, inspecting and servicing of elevator, escalator, keypad and security camera systems (the "*Business*"); and

B.      Purchaser desires to purchase from Seller, and Seller desires to sell to Purchaser, all of its right, title and interest in and to the Purchased Assets (as defined below).

NOW, THEREFORE, in consideration of the mutual promises and representations and subject to the terms and conditions herein contained, and other good and valuable consideration, had and received, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1: DEFINITIONS

**1.1      Definitions and Defined Terms**.  Capitalized terms used in this Agreement shall have the respective meanings set forth or referenced in **Exhibit A** hereto, unless otherwise defined herein.

## ARTICLE 2: PURCHASE AND SALE

**2.1      Assets to be Transferred**.  On the Closing Date, other than the Retained Assets, Purchaser shall purchase from Seller, and Seller shall sell, transfer, assign, convey and deliver to Purchaser, all of Seller's right, title and interest in all of the assets, rights and properties of every nature, kind and description, wherever located, as of the Closing Date, whether tangible or intangible, owned, leased or licensed, real, personal or mixed (collectively, the "*Purchased Assets*"), free and clear of any and all Liens, including all of the following assets:

(a)      all contracts, purchase orders, instruments, equipment leases and other agreements (whether written or oral) to which Seller is a party or by which its assets or properties are bound, only to the extent specifically listed or described on **Schedule 2.1(a)** (collectively, the "*Assumed Contracts*");

(b)      all furniture, fixtures, machinery, vehicles (other than as set forth on **Schedule 2.2(c)**), computers, equipment, tools, parts, supplies, inventory, tools, hardware, and replacement, spare, component and maintenance parts (in each case, wherever located), including any equipment leased or owned by Seller or otherwise provided by Seller to any Person;

(c)      all accounts and notes receivable, future payments, unbilled revenues, reimbursable costs and expenses and other claims for money due or payable to Seller, and any security, claim, remedy or other right related thereto (collectively, "*Accounts Receivable*");

(d)      all claims, refunds, credits, causes of action, rights of recovery, rights to proceeds and rights of set off of any kind due or payable to Seller related to or in connection with any of the Assumed Contracts or otherwise associated with the Business;

(e)      all prepaid expenses, advance payments, deposits, surety accounts and other similar deposits, including all deposits with suppliers and utilities;

(f)     all intellectual property in whatever form or medium as it may exist or currently in development, and all rights thereunder or in respect thereof, including under any and all ownership interests in and rights to the Business Name and all websites, telephone numbers and IP addresses together with all income, royalties, damages and payments related thereto (including damages and payments for past or future infringements or misappropriations thereof and the right to sue and recover for past infringements or misappropriations thereof);

(g)     all Permits, franchises, certificates of authority, certificates of occupancy, and building, safety, fire and health approvals, or any waiver of any of the foregoing, issued to any Seller by any Governmental Authority;

(h)     except for the organizational minute books and related unit records of Seller, all business records of Seller, including all books, records, ledgers, files, documents, correspondence, lists (including, customer lists and other customer information, in whatever form or medium), plats, drawings, photographs, creative materials, advertising and promotional materials, studies, reports and other materials (in whatever form or medium), owned or maintained by Seller;

(i)     all rights to proceeds under insurance policies to the extent related to or payable in connection with any of the Purchased Assets or the Assumed Liabilities;

(j)     the goodwill of the Business as a going concern; and

(k)     the assets, properties, rights and interests set forth on **Schedule 2.1(k)**.

**2.2**     **Retained Assets**.  The Purchased Assets shall not include, and Seller shall retain all of Seller's right, title and interest in and to the assets, rights and properties (collectively, the "***Retained Assets***") in the following assets:

(a)     all cash held by Seller;

(b)     any contracts, other than the Assumed Contracts; and

(c)     certain personal vehicles and other assets specifically listed on **Schedule 2.2(c)**.

### ARTICLE 3: LIABILITIES

**3.1**     **Assumed Liabilities**.  On the Closing Date, Purchaser shall assume and become responsible for, and shall thereafter pay, perform and discharge as and when due only those liabilities and obligations of Seller arising in the Ordinary Course of Business under the Assumed Contracts or specifically included as a liability in Actual Net Working Capital (collectively, the "***Assumed Liabilities***"); provided, however, that Purchaser will not assume or be responsible for any such liabilities or obligations (a) to be performed on or prior to the Closing Date or that arise from contractual breaches of such Assumed Contracts by Seller or defaults under such Assumed Contracts by Seller or (b) related to any refund, rebate or similar payment that is required to be made under the terms of any Assumed Contract, all of which liabilities and obligations constitute Retained Liabilities.

**3.2**     **Retained Liabilities**.  The Assumed Liabilities will not include, and Purchaser will not assume, any liability or obligation of Seller unless such liability or obligation is specifically identified in **Section 3.1**, and the Assumed Liabilities will not include any other liabilities of Seller (collectively, the "***Retained Liabilities***").  The Retained Liabilities will be retained by and remain the obligations of Seller, and Seller shall pay, perform and discharge as and when due the Retained Liabilities.

## ARTICLE 4: PURCHASE PRICE

**4.1      Purchase Price**.  In full consideration for the Purchased Assets, Purchaser shall on the Closing Date (a) pay to Seller by bank wire transfer of immediately available funds to an account(s) designated in writing by Seller an aggregate amount in cash equal to $3,500,000 (as adjusted pursuant to **Section 4.2(a)**) minus the Holdback Amount, minus the Retention Amount, minus the Stock Amount (such resulting amount in this clause (a) to be paid in cash, the "***Closing Payment***"), (b) deliver the Stock Consideration and (c) assume the Assumed Liabilities.  The sum of the Assumed Liabilities, the Closing Payment, the Holdback Amount, the Stock Amount and the Retention Amount are referred to herein as the "***Purchase Price***."

**4.2      Closing Date Adjustments**.

(a)      At the Closing, the Closing Payment will be adjusted as follows: the Closing Payment shall be (A) decreased to the extent that the Estimated Net Working Capital is less than the Target Net Working Capital, or (B) increased by the to the extent that Estimated Net Working Capital is greater than the Target Net Working Capital.

(b)      Seller shall deliver to Purchaser, prior to the Closing Date, a statement signed by the Owner, setting forth Seller's good faith estimate of Net Working Capital (the "***Estimated Net Working Capital***"), indicating in reasonable detail the basis for its estimates.

**4.3      Post-Closing Determinations**.

(a)      Within 120 days following the Closing Date, Purchaser shall cause to be prepared and delivered to Seller a statement (the "***Final Closing Statement***") setting forth Purchaser's computation of Net Working Capital, indicating in reasonable detail the basis for its calculations.

(b)      If Seller disagrees with the computation of the Net Working Capital reflected on the Final Closing Statement, Seller may, within 30 days after receipt of the Final Closing Statement, deliver a written notice to Purchaser setting forth Seller's calculation of the Net Working Capital indicating in reasonable detail the basis for its calculations (a "***Dispute Notice***").  If Seller does not deliver a Dispute Notice within the 30 day period, then the amount of Net Working Capital shall be deemed to be finally determined as set forth on the Final Closing Statement.  If Seller delivers a Dispute Notice within the 30 day period, Purchaser and Seller will use reasonable best efforts to resolve any disagreements as to the computation of the Net Working Capital, but if they do not obtain a final resolution within 30 days after Purchaser received the Dispute Notice, such disagreements shall be resolved by the Arbiter.  In resolving any disputed item, the Arbiter shall be bound by the provisions of this **Section 4.3**, the definitions used to define Net Working Capital in this Agreement and consider only those items that are in dispute.  Purchaser and Seller shall use their reasonable best efforts to cause the Arbiter to resolve all disagreements as soon as reasonably practicable.  The Arbiter will be required to choose either Purchaser's or Seller's position in its entirety.  The resolution of such disagreements by the Arbiter shall be final and binding on Purchaser and Seller.  Seller shall bear all fees and costs of the Arbiter if Purchaser's position is chosen by the Arbiter, and Purchaser shall bear all fees and costs of the Arbiter if Seller's position is chosen by the Arbiter.  The amount of Net Working Capital, as finally determined pursuant to this **Section 4.3(a)**, is referred to herein as the "***Actual Net Working Capital***."

**4.4**     **Post-Closing Adjustments**.

(a)     If the Actual Net Working Capital is less than the Estimated Net Working Capital, the Holdback Amount will be decreased by an amount equal to the Estimated Net Working Capital minus the Actual Net Working Capital.

(b)     If the Actual Net Working Capital is greater than the Estimated Net Working Capital, the Holdback Amount will be increased by an amount equal to the Actual Net Working Capital minus the Estimated Net Working Capital.

**4.5**     **Release of the Holdback Amount and the Retention Amount**.

(a)     On the first Business Day upon reaching the 18-month anniversary of the Closing Date, Purchaser shall pay Seller an amount equal to (A) the Holdback Amount (as adjusted pursuant to **Section 4.4**) minus (B) the value of all Losses (whether pending or final, as included in any Liability Claims) for which Seller is obligated to indemnify Purchaser. To the extent any pending Liability Claims are included in the prior sentence, such amounts will be released or retained, as the case may be, following the resolution of such pending Liability Claims.

(b)     One third of the Retention Amount shall be paid by Purchaser to Seller within 30 days after the end of each of calendar years 2019, 2020 and 2021 so long as the Owner is still employed by, and in good standing based on a objective commercial standard for the industry with, Purchaser as of the last day of such calendar year.

**4.6**     **Allocation of Purchase Price**. The Purchase Price will be allocated among the Purchased Assets as set forth on **Schedule 4.6** attached hereto and Section 1060 of the Code (or any similar provision of state or local Law, as appropriate). Each of the parties hereto shall report the purchase and sale of the Purchased Assets in accordance with **Schedule 4.6** for all income Tax purposes, including for purposes of filing IRS Form 8594 and all other Tax Returns filed by each of them (unless otherwise required by Law), and each of them will not voluntarily take any position inconsistent therewith upon examination of any such Tax Return, in any Proceeding or otherwise with respect to such Tax Returns (unless otherwise required by a final determination (as defined in Section 1313 of the Code)). Purchaser and Seller each agree to provide the other promptly with any other information required to complete Form 8594.

## ARTICLE 5: CLOSING

**5.1**     **Closing**. The closing of the transactions contemplated hereby (the "***Closing***") will take place upon the mutual exchange of executed copies of this Agreement on the Closing Date.

**5.2**     **Deliveries by the Seller Group**. On the Closing Date, the Seller Group shall deliver to Purchaser the following items, in each case, in form and substance reasonably satisfactory to Purchaser:

(a)     a letter from Seller's lender(s), if any, releasing any and all Liens and security interests against any of the Purchased Assets and authorizing Purchaser to file all appropriate Uniform Commercial Code termination statements to evidence the release of all existing Liens on the Purchased Assets, if any;

(b)     the bill of sale, in the form of **Exhibit B** attached hereto (the "***Bill of Sale***"), executed by Seller;

4

(c)     the Lease Agreement, in the form attached hereto as **Exhibit C**, executed by RTPT LLC, a Massachusetts limited liability company;

(d)     title to all vehicles included in the Purchased Assets, duly endorsed for transfer to Purchaser as of the Closing Date;

(e)     possession of the Purchased Assets;

(f)     a certificate executed by Seller certifying that it is not a "foreign person" as defined in Section 1445 of the Code;

(g)     a Joinder Agreement to the Stockholders Agreement of Parent, dated as of the Closing Date, duly executed by the Owner; and

(h)     such other documents and instruments as Purchaser reasonably requests to consummate the transactions contemplated hereby.

**5.3     Deliveries by Purchaser**.  On the Closing Date, Purchaser shall deliver to Seller the following items:

(a)     the Closing Payment;

(b)     the Stock Consideration;

(c)     the Lease Agreement, executed by Purchaser;

(d)     the assumption agreement, each in substantially the form of **Exhibit D** attached hereto (the "*Assumption Agreement*"), executed by Purchaser; and

(e)     such other documents and instruments as Seller reasonably requests to consummate the transactions contemplated hereby.

**ARTICLE 6: REPRESENTATIONS AND WARRANTIES OF THE SELLER GROUP**

Each member of the Seller Group jointly and severally represents and warrants to Purchaser as follows:

**6.1     Existence and Good Standing**.  Seller is a corporation duly formed, validly existing and in good standing under the Laws of the Commonwealth of Massachusetts and is duly qualified to do business as a foreign entity and is in good standing in the jurisdictions in which Seller is required to be so qualified.

**6.2     Power; Enforceability**.  Seller has the power and authority to (i) own, operate and lease the Purchased Assets, (ii) carry on the Business as currently conducted and (iii) perform its obligations under the Assumed Contracts.  Each member of the Seller Group has the requisite power and authority or capacity, as the case may be, to execute, deliver and perform fully his or its respective obligations under this Agreement and the Ancillary Agreements.  The Owner is the sole owner of all right, title and interest (legal, record and beneficial) in and to the capital stock of Seller, which such capital stock constitute all of the issued and outstanding equity interests of Seller.  The execution, delivery and performance of this Agreement and the Ancillary Agreements, and the consummation of the transactions contemplated hereby and thereby, have been duly and validly authorized by all necessary action on the part of each member of

the Seller Group, as applicable, and constitutes the valid and legally binding obligation of the members of the Seller Group enforceable against each member of the Seller Group, as applicable, in accordance with their terms.

### 6.3    Purchased Assets.

(a)    Seller has good and marketable title to, or valid and enforceable leasehold interests in or license to or right of use for, all of the Purchased Assets, free and clear of all Liens. Upon the consummation of the transactions contemplated in this Agreement and the Ancillary Agreements, Purchaser will acquire good and transferable title in or to, or valid leasehold interests in or license to or right of use for, all of the Purchased Assets, free and clear of any Lien. Seller is the only entity through which the Business is conducted. Neither of the Owner nor his Affiliates own or have any interest in any assets related to the Business (other than the Owner's equity ownership of Seller). Seller has provided to Purchaser true, correct and complete copies of each Assumed Contract, as amended to date. The Purchased Assets are in good operating condition and repair (subject to normal wear and tear) and have been maintained, repaired and replaced in the Ordinary Course of Business consistent with standards generally followed in the industry of the Business and are suitable for their present uses.

(b)    Each Assumed Contract is a valid, binding and enforceable obligation of Seller and the other party or parties thereto, as applicable, enforceable in accordance with its terms. With respect to the Assumed Contracts: (i) neither Seller nor any other party thereto is in breach, default under or in violation of any Assumed Contract; (ii) no event has occurred that, with notice or lapse of time or both, would constitute such a breach, default or violation, or permit termination, modification or acceleration, under any Assumed Contract; (iii) no other party to any of the Assumed Contracts intends to terminate, adversely modify or not renew any Assumed Contract; (iv) the Assumed Contracts will continue to be legal, valid, binding, enforceable and in full force and effect on identical terms following the Closing; (v) there are no pending or threatened claims, disputes or controversies under any Assumed Contract; (vi) Seller has not offered or issued any grant or other form of financial assistance to or offered, issued or engaged in any promotional sale, discount, rebate, price reduction or extended payment terms (or similar activity outside the Ordinary Course of Business) under any Assumed Contract; and (vii) Seller has not assigned, delegated, transferred, released or waived any of its rights under any Assumed Contract. Seller has provided Purchaser a true, correct and complete list of the Assumed Customers. All of the Assumed Customers continue to be customers of Seller and none of the Assumed Customers has reduced its business with Seller from the levels achieved during the trailing 12-month period prior to the Closing, and no such reduction is expected to occur. No such Assumed Customer intends to (i) terminate or fail to renew its relationship, (ii) stop, decrease the rate of or otherwise modify any of the terms (whether related to payment, price or otherwise) of its relationship (whether as a result of the consummation of the transactions contemplated hereby or otherwise). No member of the Seller Group has knowledge that any such Assumed Customer will not continue to be a customer of Purchaser after the Closing. Neither Seller nor the Owner is involved in any pending or threatened claim, dispute or controversy with any Assumed Customer.

(c)    With respect to each such Government Contract: (i) Seller has complied with all material terms and conditions of such Government Contract (including applicable Laws or agreements pertaining thereto) and is not in receipt of any claim of default or breach under any such Government Contract; (ii) all representations and certifications made by Seller with respect to any such Government Contract were accurate as of their effective date, all invoices and remittances to Governmental Authorities or others in connection with such Government Contracts were accurate when submitted or have been promptly corrected, and all applicable adjustments,

discounts, rebates and interest have been properly and timely reported and credited; (iii) no Governmental Authority nor any prime contractor, subcontractor or other Person has notified Seller that any member of the Seller Group has breached or violated any applicable Law, certification, representation, clause, provision or requirement pertaining to such Government Contract; (iv) no termination for default, cure notice or show cause notice has been received that pertains to such Government Contract, nor has any termination for convenience been received; and (v) to the knowledge of any member of the Seller Group, neither Seller nor any of its current or former employees, contractors and agents is under civil, administrative or criminal investigation or indictment or has information with respect to any alleged overpricing or overcharge, false claim, false statement, misrepresentation, product substitution, parts counterfeiting, fraudulent or criminal activity involving a Government Contract, nor has any member of the Seller Group received or submitted any notice of an investigation, demand, subpoena, disclosure, report or document request regarding any such concerns. Seller has not been determined to be non-responsible or debarred or suspended from participation in the award of contracts with any Governmental Authority or proposed or threatened with being debarred, suspended or found non-responsible.

6.4     **Financial Information**.  Attached as **Schedule 6.4** are correct and complete copies of (i) the balance sheets of Seller as of December 31, 2016 and December 31, 2017 and the related statements of income for the years then ended and the other financial information included therewith (collectively, the "*Historical Financial Statements*"), (ii) the balance sheet of Seller as of June 30, 2018 and the related statement of income for the six-month period then ended and the other financial information included therewith (collectively, the "*Latest Financial Statements*") and (iii) the balance sheets of Seller and the related statement of income as of the last day of each month beginning July 31, 2017 through June 30, 2018 (collectively, the "*Monthly Financial Statements*," and together with the Historical Financial Statements and the Latest Financial Statements, collectively, the "*Financial Statements*").  The Financial Statements present fairly the financial positions, results of operations of Seller at the dates and for the time periods indicated, and have been prepared on a cash basis, consistently applied throughout the periods indicated. The Financial Statements were derived from the books and records of Seller.  Seller does not have any liabilities (whether accrued, absolute, contingent, unliquidated or otherwise, whether due or to become due, whether known or unknown, regardless of when asserted) arising out of transactions or events entered into prior to the Closing Date, or any action or inaction, or any state of facts existing, with respect to or based upon transactions or events occurring prior to the Closing Date, except (i) liabilities reflected on the face of the balance sheet included in the Latest Financial Statements or (ii) liabilities that have arisen after the date of the Latest Financial Statements in the Ordinary Course of Business (none of which is material or relates to breach of contract, breach of warranty, tort, infringement, violation of Law or environmental liability).  All Accounts Receivable represent sales actually made in the Ordinary Course of Business or valid claims as to which full performance has been rendered by Seller and are collectible and will be collected in the Ordinary Course of Business.  No counter claims, defenses or offsetting claims with respect to the Accounts Receivable are pending or threatened.  All of the Accounts Receivable relate solely to sales of goods or services to Assumed Customers with respect to the Business, none of which are Affiliates of Seller.  The inventories of Seller are of a quality and quantity useable and saleable in the Ordinary Course of Business and fit for the purpose for which they were procured.  The quantities of each item of inventory are not excessive, but are reasonable in the present circumstances of the Business.  None of Seller's inventory is held on consignment, or otherwise, by third parties.

6.5     **Personnel**.

(a)     Except for Seller's contractual agreement with the International Union of Elevator Constructors, dated July 9, 2017, (i) Seller is not a party to or bound by any union contract, collective bargaining agreement, collective bargaining relationship or other similar type of contract and has not agreed to recognize any other union, labor organization or other collective bargaining

representative, (ii) no union, labor organization or collective bargaining representative has been certified as representing the employees of Seller and (iii) no organizational attempt has been made or threatened by or on behalf of any labor union, labor organization, collective bargaining representative or collective bargaining unit with respect to any employees of Seller. There are no representation proceedings or petitions pending or threatened to be brought or filed with the National Labor Relations Board or comparable Governmental Authority involving any employee of Seller. No union decertification activity has been underway or threatened with respect to any employee of Seller. Seller has not experienced any labor strike, arbitration, grievance, unfair labor practice charge or complaint, lockout, picket, dispute, slowdown or stoppage or any other labor difficulty during the past five years and, to the knowledge of any member of the Seller Group, there are no facts or circumstances that may lead to any such labor difficulty. With respect to the transactions contemplated by this Agreement, Seller has satisfied any notice, consultation or bargaining obligations owed to its employees or their representatives under applicable Law, collective bargaining agreement or other contract. In the past five years, Seller has not implemented any plant closing or mass layoff implicating the Worker Adjustment and Retraining Notification Act or similar Law, nor are any such actions contemplated, planned or announced.

(b)     **Schedule 6.5(b)** sets forth a true, complete and accurate list of each employee and (as applicable) such Person's date(s) of hire, position and title (if any), current rate of compensation (including target bonuses, commissions and incentive compensation, if any), whether such Person is hourly or salaried and such Person's hourly rate or annual base salary, whether such Person is exempt or non-exempt, the number of such Person's accrued sick days and vacation days, whether such Person is absent from active employment and, if so, the date such Person became inactive and, if applicable, the anticipated date of return to active employment. Seller has paid all wages, salaries, wage premiums, expense reimbursements, severance, commissions, bonuses, fees and other compensation that have come due and payable to its current and former employees and independent contractors under applicable Law, contract or Seller policy. Seller is not liable for any fines, taxes, interest or other penalties for any failure to pay or delinquency in paying such compensation and each individual who has provided services to Seller within the past three years and has been classified and treated by Seller as an independent contractor, leased employee, temporary employee or similar non-employee service provider has been properly classified and treated as such for purposes of applicable Law. Seller is not liable for any payment to any trust or other fund, or to any Governmental Authority, with respect to unemployment compensation benefits, social security or other benefits or obligations for employees. There are no pending claims against Seller under any workers compensation plan or policy or for long term disability. Seller does not contribute to, have any obligation to contribute to, or have any liability under or with respect to any employee benefit plan that is a "defined benefit plan" (as defined in ERISA §(35)). None of the Purchased Assets are subject to any Lien under ERISA or the Code.

**6.6     Intellectual Property**. There is no material intellectual property used in the Business. Seller is in compliance in all material respects with internal privacy policies and terms of use and with all applicable data protection, privacy and other Laws governing the collection, use, storage, distribution, transfer or disclosure (whether electronically or in any other form or medium) of any personal information or data. There has not been any notice to, complaint against, Proceeding or investigation conducted or claim asserted with respect to Seller by any Person (including any Governmental Authority) regarding the collection, use, storage, distribution, transfer or disclosure of personal information, and none is pending, or threatened.

**6.7     Litigation**. Except as set forth on **Schedule 6.7**, there is no instance, and there has been no instance in the past five years, in which any member of the Seller Group, in connection with the operation of the Business or the Purchased Assets, is or has been (a) subject to any unsatisfied Order or (b) a party,

or, to the knowledge of any member of the Seller Group, is threatened to be made a party, to any Proceeding. Seller is now and has been in compliance with all material Laws and Orders applicable to the Purchased Assets and the Business.

**6.8     Taxes**. (i) all Taxes owed by Seller (whether or not shown or required to be shown on any Tax Return) have been timely paid; (ii) there are no Tax Proceedings by any Governmental Authority pending or threatened in connection with any Taxes due from Seller; (iii) Seller has not waived (or requested to waive) any statute of limitations in respect of Taxes or agreed to (or requested) any extension of time with respect to a Tax assessment or deficiency; and (iv) Seller has properly collected and remitted sales and similar Taxes with respect to sales made to its customers or has properly received and retained any appropriate Tax exemption certificates and other documentation for all sales made without charging or remitting sales or similar Taxes that qualify such sales as exempt from sales and similar Taxes.

**6.9     Consents**. No consent of any third party or governmental or regulatory authority is required in connection with the execution and delivery by any member of the Seller Group of this Agreement or the Ancillary Agreements or the consummation of the transactions contemplated hereby or thereby.

**6.10    Brokers**. No Person has acted directly or indirectly as a broker, finder or financial advisor for any member of the Seller Group in connection with the negotiations relating to the transactions contemplated by this Agreement, and no Person is entitled to any fee or commission or like payment in respect thereof based in any way on any agreement, arrangement or understanding made by or on behalf of any member of the Seller Group.

## ARTICLE 7: **REPRESENTATIONS AND WARRANTIES OF PURCHASER**

Purchaser hereby represents and warrants to Seller as follows:

**7.1     Existence and Good Standing**. Purchaser is a corporation duly formed, validly existing and in good standing under the laws of the Commonwealth of Massachusetts.

**7.2     Power; Enforceability**. Purchaser has the power and authority to execute, deliver and perform fully its obligations under this Agreement and the Ancillary Agreements. The execution, delivery and performance of this Agreement and the Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby have been duly and validly authorized by all necessary action on the part of Purchaser and constitute the valid and legally binding obligations of Purchaser enforceable against Purchaser in accordance with their terms.

**7.3     Brokers**. No Person has acted directly or indirectly as a broker, finder or financial advisor for Purchaser in connection with the negotiations relating to the transactions contemplated by this Agreement, and no Person is entitled to any fee or commission or like payment in respect thereof based in any way on any agreement, arrangement or understanding made by or on behalf of Purchaser for which any member of the Seller Group will be liable to make any payment.

## ARTICLE 8: **COVENANTS AND AGREEMENTS**

**8.1     Further Assurances**. From and after the Closing Date, at the request of the other party, the members of the Seller Group, on the one hand, and Purchaser, on the other hand, shall execute and deliver or cause to be executed and delivered to the other party such deeds, bills of sale, assignments or other instruments to the other party in addition to those required by this Agreement, as such party may reasonably request, in order to implement the transactions contemplated by this Agreement.

**8.2**     **Transfer Taxes**.  All transfer, documentary, sales, use, stamp, registration, title and other such Taxes, and all conveyance fees, recording charges and other charges and fees (including any penalties and interest) incurred in connection with consummation of the transactions contemplated by this Agreement ("***Transfer Taxes***") are to be paid 50% by Purchaser and the other 50% by the Seller Group when due, and Tax Returns relating to Transfer Taxes shall be filed by the party responsible for filing such Tax Return under applicable Law.  The parties and their Affiliates shall cooperate in connection with the filing of any such Tax Returns including joining in the execution of such Tax Returns.

**8.3**     **Accounts Receivable**.  If any member of the Seller Group receives any payment relating to any Purchased Asset after the Closing Date, including any Accounts Receivable or future payment under an Assumed Contract, such payment shall be the property of, and shall be immediately forwarded and remitted to, Purchaser.  Such member of the Seller Group will promptly (but in no event later than five Business Days after receipt thereof) endorse and deliver to Purchaser any cash, checks or other documents received by such member of the Seller Group on account of any such Purchased Asset, including Accounts Receivable.  Each member of the Seller Group shall advise Purchaser (as promptly as possible following becoming aware thereof) of any counterclaims or set-offs by any third party that arise subsequent to the Closing Date with respect to any such Purchased Asset, including any Accounts Receivable.

**8.4**     **Confidential Information**.  Each member of the Seller Group shall not disclose or use at any time after the Closing any Confidential Information, whether or not such information is developed by such member of the Seller Group.  Each member of the Seller Group shall take all appropriate steps to safeguard Confidential Information and take reasonable steps to protect it against disclosure, misuse, loss and theft.

**8.5**     **Noncompetition**.  Each member of the Seller Group hereby acknowledges that he or it is privy to highly confidential or proprietary business information and trade secrets and other non-public or Confidential Information that relates to the Business.  Each member of the Seller Group acknowledges and agrees that Purchaser would be irreparably damaged if he or it were to provide services other than those as a technician as expressly allowed herein, to any Person competing with Purchaser or engaged in a business similar to the Business and that such competition or engagement by he or it would result in a significant loss of goodwill by Purchaser that is derived in this Agreement.  The Owner acknowledges and agrees that he will receive substantial direct and indirect benefits by virtue of the transactions contemplated by this Agreement.  Each member of the Seller Group further acknowledges and agrees that the covenants and agreements set forth herein are a material inducement to Purchaser entering into this Agreement and to perform its obligations hereunder, and that Purchaser would not obtain the benefit of the bargain set forth in this Agreement as specifically negotiated by the parties if any member of the Seller Group breached the provisions of this **Section 8.5**.  Each member of the Seller Group further acknowledges that he or it has been substantially responsible for the growth and development of the Business and the creation and preservation of the goodwill of the Business.  Therefore, in further consideration of the amounts to be paid hereunder, and for other good and valuable consideration, each member of the Seller Group agrees that during the period commencing with the Closing Date and ending on the five year anniversary of the Closing Date (the "***Restricted Period***"), each member of the Seller Group shall not (and shall cause each of its Affiliates not to) directly or indirectly (i) solicit, persuade, induce, service or attempt to solicit, persuade, induce or service any customer of the Business (for the avoidance of doubt, the term "customer" as used in this sentence shall include any entity listed on **Schedule 2.1(a)**, any direct beneficiary of the Assumed Contracts and any council, Person or group of Persons who is the decision maker of the Assumed Contracts) or (ii) (a) engage in, participate in or own any interest in, consult with, render services for or assist others to engage in the Business or the business that Purchaser conducts, in each case, anywhere in Massachusetts, New Hampshire, Maine, Connecticut or Rhode Island (collectively, the "***Territory***") or (b) consult, manage or otherwise participate in the operation of any business that competes, directly or indirectly, with the Business anywhere in the Territory.  For purposes of this Agreement, the term "participate in" shall include

10

having any interest in or managing or controlling any corporation, partnership, joint venture or other entity, whether as a sole proprietor, owner, stockholder, partner, joint venturer, creditor or otherwise, or rendering any direct or indirect service or assistance to any individual, corporation, partnership, joint venture and other business entity (whether as a director, officer, manager, supervisor, employee, partner, agent, representative, consultant or otherwise).  Notwithstanding the foregoing in this **Section 8.5**, in the event that the Owner's employment with Purchaser is terminated without cause (as determined in good faith by utilizing an objective commercial standard by the Board of Directors of Purchaser), the Owner shall be permitted to be employed by any Person that is a competitor to the Business; provided that the Owner's employment services provided to any such competitor are at all such times limited directly to such services that are provided by a technician (which services are consistent with ordinary industry practices) and the Owner shall not directly or indirectly own any interest in or render any other services (including any sales-related tasks or services) to any such Person employing the Owner pursuant to the terms of this sentence.

     **8.6**    **Nonsolicitation**.  During the Restricted Period, each member of the Seller Group shall not (and shall cause each of his or its Affiliates not to), directly or indirectly, either for himself or itself or through any other Person, (i) employ, solicit, induce or attempt to employ, solicit or induce any employee or independent contractor of Purchaser or its Affiliates to terminate or refrain from accepting, renewing or extending his, her or its employment by or consulting or agency relationship with Purchaser or its Affiliates, (ii) hire any Person who was an employee, officer or independent contractor of Purchaser or its Affiliates at any time during the Restricted Period or Seller during the one year period prior to the Closing Date or (iii) induce or attempt to induce any customer, sales representative, supplier, licensee, licensor, lessor or other business relation of Seller (or any prospective customer, sales representative, supplier, licensee, licensor, lessor or other business relation with which Seller has entertained discussions regarding a prospective business relationship with respect to the Business) to cease or refrain, reduce or curtail its business, or in any way interfere with the relationship (or prospective relationship) between any such customer, sales representative, supplier, licensee, licensor or other business relation (including making any negative statements or communications about the Purchaser or its Affiliates).

     **8.7**    **Additional Customer Proposals**.  During the Restricted Period, if any member of the Seller Group receives or becomes aware of any request, offer, solicitation, proposal, notice or any similar arrangement (prospective or otherwise) related to the Business from any Person or group of Persons (a "*Customer Proposal*"), then the members of the Seller Group shall promptly notify (but in no event later than three Business Days after any such member of the Seller Group becomes aware thereof) Purchaser of the Customer Proposal and provide Purchaser with all information and documents received by the members of the Seller Group related to such Customer Proposal.

     **8.8**    **Additional Acknowledgements**.  Each member of the Seller Group acknowledges that the provisions of **Sections 8.4**, **8.5**, **8.6** and **8.7** are in consideration of: (i) the transactions contemplated by this Agreement, (ii) the Purchase Price and (iii) additional good and valuable consideration as set forth in this Agreement of which each member of the Seller Group will receive a substantial direct or indirect benefit. Each member of the Seller Group agrees and acknowledges that the restrictions contained in **Sections 8.4**, **8.5**, **8.6** and **8.7** do not preclude such member of the Seller Group from earning a livelihood, nor do they unreasonably impose limitations on such member of the Seller Group's ability to earn a living.  In addition, each member of the Seller Group agrees and acknowledges (x) that the Business will be conducted throughout the Territory and (y) notwithstanding the state of organization or principal office of Purchaser or any of its facilities, or any of its executives or employees, it is expected that Purchaser will have business activities and have valuable business relationships within its industry throughout the Territory.  Each member of the Seller Group agrees and acknowledges that the potential harm to Purchaser of the non-enforcement of any provision of **Sections 8.4**, **8.5**, **8.6** and **8.7** outweighs any potential harm to any member of the Seller Group of its enforcement by injunction or otherwise.  Each member of the Seller Group acknowledges that he or it has carefully read or arranged for review of **Sections 8.4**, **8.5**, **8.6** and **8.7** and

either consulted with legal counsel of his, her or its choosing regarding its contents or knowingly and voluntarily waived the opportunity to do so, has given careful consideration to the restraints imposed upon each member of the Seller Group by **Sections 8.4**, **8.5**, **8.6** and **8.7** and is in full accord as to their necessity for the reasonable and proper protection of confidential and proprietary information of the Business and Purchaser now existing or to be developed in the future. Each member of the Seller Group expressly acknowledges and agrees that each and every restraint imposed by **Sections 8.4**, **8.5**, **8.6** and **8.7** is reasonable with respect to subject matter, time period and geographical area.

        **8.9**    **Use of Business Name**. After the Closing, no member of the Seller Group or any of their Affiliates shall use the Business Name or any name bearing any resemblance to the Business Name in the operation of their businesses or otherwise. No later than 30 days following the Closing Date, the Seller Group shall provide evidence to Purchaser that the Business Name of Seller has been amended in its organizational documents to not include the Business Name or any variation thereof.

        **8.10**    **Required Withholding**. Notwithstanding anything herein to the contrary, Purchaser shall be entitled to withhold from any and all cash amounts payable hereunder an amount equal to any withholding Tax owed to any Governmental Authority to the extent required under applicable Law. To the extent that amounts are so withheld by Purchaser, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to Seller in respect of which such deduction and withholding was made by Purchaser.

**ARTICLE 9: REMEDIES**

    **9.1**    **General Indemnification Obligation**.

        (a)    Each member of the Seller Group shall jointly and severally indemnify and hold harmless, and shall pay, compensate and reimburse, Purchaser and its officers, managers, members, employees, agents and Affiliates from and against any and all losses, liabilities, claims, damages, diminution in value, penalties, fines, judgments, awards, settlements, Taxes, costs, fees, expenses (including reasonable attorneys' and accountants' fees and costs) and disbursements (collectively, "***Losses***"), regardless of whether or not such Losses relate to any third party claim, based upon, arising out of or otherwise in respect of (i) any inaccuracies in, or any breach of, any representation or warranty of any member of the Seller Group contained in this Agreement (including any schedule, annex or exhibit attached hereto) or any Ancillary Agreement, (ii) any breach or nonperformance of any covenant or agreement of any member of the Seller Group contained in this Agreement (including any schedule, annex or exhibit attached hereto) or any Ancillary Agreement, (iii) any of the Retained Liabilities and (iv) except for the Assumed Liabilities, any liability relating to or arising from the operation of the Business prior to the Closing Date. Purchaser shall indemnify and hold harmless, and will pay, compensate and reimburse, the Seller Group and its respective officers, managers, members, employees, agents and Affiliates from and against any and all Losses based upon, arising out of or otherwise in respect of (i) any inaccuracies in or any breach of any representation or warranty of Purchaser contained in this Agreement (including any schedule, annex or exhibit attached hereto) or any Ancillary Agreement, (ii) any breach or nonperformance of any covenant or agreement of Purchaser contained in this Agreement (including any schedule, annex or exhibit attached hereto) or any Ancillary Agreement and (iii) any of the Assumed Liabilities. The representations, warranties, covenants and agreements of the Seller Group contained in this Agreement or in any Ancillary Agreement will survive after the Closing Date. Notwithstanding anything to the contrary contained in this **Article 9**, Purchaser may, at its option, offset the indemnification obligations of the Seller Group under this **Article 9** against any amounts due or to become due under this Agreement or any Ancillary Agreement.

(b)    Each of the representations and warranties of the Seller Group and Purchaser contained in this Agreement (including any schedule, annex or exhibit attached hereto) or in any Ancillary Agreement shall survive the Closing of the transactions contemplated hereby for a period of two years after the Closing (the "*Expiration Date*"), after which no claim for indemnification for the breach or inaccuracy of any representation or warranty contained in this Agreement (including any schedule, annex or exhibit attached hereto) or in any Ancillary Agreement may be brought and no action with respect thereto may be commenced; provided, however, that (i) the Expiration Date for any Liability Claim relating to a breach or inaccuracy of the representations and warranties set forth in **Section 6.1** (Existence and Good Standing), **Section 6.2** (Power; Enforceability), **Sections 6.3(a)** and **6.3(c)** (Purchased Assets), **Section 6.5** (Personnel), **Section 6.8** (Taxes), **Section 6.9** (Consents), **Section 6.10** (Brokers), **Section 7.1** (Existence and Good Standing), **Section 7.2** (Power; Enforceability), **Section 7.3** (Brokers) shall be the date that is the ten year anniversary of the Closing Date (collectively, the representations and warranties referenced above, the "*Core Representations*") and (ii) any Liability Claim pending on the applicable Expiration Date for which a Claims Notice has been given in accordance with **Section 9.2** on or before such Expiration Date may continue to be asserted and indemnified against until finally resolved.  All of the covenants and agreements arising from, incident to or in connection with, this Agreement (including any schedule, annex or exhibit attached hereto) or any Ancillary Agreement shall survive until such covenants and agreements are fully satisfied and require no performance or forbearance.

**9.2**    **Notice and Opportunity to Defend**.  As soon as is reasonably practicable after the Seller Group, on the one hand, or Purchaser, on the other hand, becomes aware of any claim that it or they has or have under **Section 9.1** hereof that may result in a Loss (a "*Liability Claim*"), such party (the "*Indemnified Party*") shall give notice thereof (a "*Claims Notice*") to the other party (the "*Indemnifying Party*").  A Claims Notice must describe the Liability Claim in reasonable detail and indicate the amount (estimated, if necessary and to the extent feasible) of the Loss that has been or may be suffered by the Indemnified Party. If the Indemnifying Party, within 15 calendar days after the receipt by the Indemnifying Party of such Claims Notice, does not notify the Indemnified Party, in writing, that the Indemnifying Party disputes, in whole or in part, the applicable Liability Claim described in such Claims Notice, then at the end of such 15 calendar day period, the amount of Losses with respect to such Liability Claim shall be deemed to be finally determined as set forth in the Claims Notice.  In the event that Purchaser submits a Claims Notice and the amount of Losses set forth in such Claims Notice are finally determined pursuant to the immediately preceding sentence, by joint written agreement by Seller and Purchaser or pursuant to a Final Determination, the Holdback Amount shall be automatically decreased by an amount equal to such amount of Losses.  No delay in or failure to give a Claims Notice by the Indemnified Party to the Indemnifying Party pursuant to this **Section 9.2** will adversely affect any of the other rights or remedies that the Indemnified Party has under this Agreement or alter or relieve the Indemnifying Party of its obligation to indemnify the Indemnified Party to the extent that such delay or failure has not materially prejudiced the Indemnifying Party.  The Indemnifying Party shall not have the right to assume and conduct the defense of any Liability Claim without the prior written consent of the Indemnified Party.  The Indemnifying Party or the Indemnified Party, as the case may be, will have the right to participate in (but not control), at its own expense, the defense of any Liability Claim that the other is defending as provided in this Agreement.  The Indemnifying Party, if it has assumed the defense of any Liability Claim as provided in this Agreement, shall not, without the prior written consent of the Indemnified Party, consent to a settlement of, or the entry of any judgment arising from, any such Liability Claim.  The Indemnified Party has the right to settle any Liability Claim, the defense of which has not been assumed by the Indemnifying Party.

## ARTICLE 10: MISCELLANEOUS

**10.1    Press Release and Announcements**.  No party shall issue any press release or other external announcement or disclosure of any kind relating to the subject matter of this Agreement or the transactions contemplated hereunder without the prior approval of the other party; provided, however, that nothing shall prevent Purchaser or its Affiliates from making any such press release or other public announcement following the Closing that describes the nature of this transaction in general terms, without setting forth the Purchase Price or the manner of its determination.

**10.2    Expenses**.  Each of the parties hereto shall bear their respective expenses incurred or to be incurred in connection with the execution and delivery of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

**10.3    No Assignment**.  The rights and obligations of the parties hereunder may not be assigned without the prior written consent of the other party hereto.  Notwithstanding the previous sentence, Purchaser may, without the consent of any of the Seller Group, assign its rights under this Agreement to any lender of Purchaser, to any Affiliate of Purchaser or in connection with any disposition or transfer of all or any material portion of the equity, business or assets of Purchaser (whether such sale is structured as a sale of equity, sale of assets, a merger or otherwise).

**10.4    Integration, Modification and Waiver**.  This Agreement and the Ancillary Agreements, together with the exhibits, schedules and certificates or other instruments delivered hereunder, constitutes the entire agreement among the parties hereto with respect to the subject matter hereof and supersedes all prior understandings of the parties; provided that the covenants contained in this Agreement are independent of, supplemental to, and do not modify, supersede or restrict (and shall not be modified, superseded or restricted by) any noncompetition, nonsolicitation, confidentiality or other restrictive covenant in any other prior, current or future agreement unless reference is made to the specific provisions hereof that are intended to be modified, superseded or restricted.  No supplement, modification or amendment of this Agreement will be binding unless executed in writing by each of the parties hereto.  No waiver of any of the provisions of this Agreement will be deemed to be or will constitute a continuing waiver.  No waiver will be binding unless executed in writing by the party making the waiver.

**10.5    Construction**.  The parties have participated jointly in the negotiation and drafting of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties and no presumption or burden of proof will arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.  The headings contained in this Agreement are included for purposes of convenience only, and will not affect the meaning or interpretation of this Agreement.  The words "include," "includes" and "including" do not limit the preceding words or terms and shall be deemed to be followed by the words "without limitation."  The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  Any reference to any federal, state, local or foreign statute or Law will be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.  Any references to any period of days shall be deemed to be to the relevant number of calendar days unless otherwise specified.  The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms, and pronouns stated in masculine, feminine or neutral genders shall include the masculine as well as the feminine and neutral genders.

**10.6    Severability**.  If any provision of this Agreement or the application of any provision hereof to any party or circumstance is, to any extent, adjudged invalid or unenforceable, the application of the

remainder of such provision to such party or circumstance, the application of such provision to other parties or circumstances, and the application of the remainder of this Agreement will not be affected thereby. The parties agree that a court of competent jurisdiction making a determination of the invalidity or unenforceability of any term or provision of **Sections 8.4**, **8.5** and **8.6** of this Agreement shall have the power and is hereby instructed to reduce the scope, duration or area of any such term or provision, to delete specific words or phrases or to replace any invalid or unenforceable term or provision in **Sections 8.4**, **8.5** and **8.6** with a term or provision that is the maximum duration, scope and area permitted by Law, in all cases giving effect to the intent of the parties that the restrictions contained herein be given effect to the broadest extent possible, and this Agreement shall be enforceable as so modified.

   **10.7**   **Notices**.   All notices, demands and other communications given or delivered under this Agreement shall be in writing and shall be deemed to have been given, (i) when received if given in person, (ii) on the date of electronic confirmation of receipt if sent by email, facsimile or other wire transmission, (iii) three days after being deposited in the U.S. mail, certified or registered mail, postage prepaid or (iv) one day after being deposited with a reputable overnight courier. Notices, demands and communications to the parties shall, unless another address is specified in writing, be sent to the address or facsimile number indicated below:

If to the Seller Group:

Ronald S. Tremblay
100 Fenecroft RD #106
Danvers MA 01923
Facsimile: [                    ]
Email:

with copy to:

Falbo, Solari & Goldberg, PC
5 Essex Green Drive, Suite 34
Attention:  Russell Z. Goldberg, Esq.
Facsimile: (978) 532-5222
E-mail: RZGoldberg@fsglaw.com

If to Purchaser:

3 Phase Elevator Corp.
c/o Fort Point Capital
185 Dartmouth Street, 6th Floor
Boston, Massachusetts 02116
Attention: Paul Lipson and Michael Strachan
Facsimile: (617) 303-2446
E-mail: plipson@fortpointcapital.com and mike@3phaseelevator.com

15

with copy to:

Kirkland & Ellis LLP
300 North LaSalle St.
Chicago, Illinois 60654
Attention: Walter S. Holzer, P.C.
Facsimile: (312) 862-2200
E-mail: walter.holzer@kirkland.com

Any party hereto may change its mailing address, e-mail or facsimile number for the purposes of this **Section 10.7** by giving notice as provided herein.

**10.8     Governing Law; Consent to Jurisdiction**.  This Agreement shall be interpreted and construed in accordance with the laws of the State of Delaware.  Any and all claims, controversies, and causes of action arising out of or relating to this Agreement, whether sounding in contract, tort or statute, shall be governed by the laws of the State of Delaware, including its statutes of limitations, without giving effect to any conflict-of-laws or other rule that would result in the application of the laws of a different jurisdiction.  Each party hereto agrees that it will bring any action between the parties hereto arising out of or related to this Agreement exclusively in the Superior Court, Business Litigation Session (the "*BLS*") or, to the extent the BLS does not have subject matter jurisdiction, the United States District Court for the District of Massachusetts and the appellate courts having jurisdiction of appeals in such courts (the "*Massachusetts Federal Court*," and together with the BLS, the "*Selected Courts*").  In the event of any litigation under this Agreement, exclusive of any actions relative to the leasehold interest which must be litigated in Essex Superior Court, with respect to any such action each party (a) irrevocably submits to the exclusive jurisdiction of the Selected Courts, (b) waives any objection to laying venue in any such action in the Selected Courts and (c) waives any objection that the Selected Courts are an inconvenient forum or do not have jurisdiction over any party hereto.

**10.9     WAIVER OF JURY TRIAL**.  EACH OF THE PARTIES IRREVOCABLY WAIVES ITS RIGHT TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY DEALINGS AMONG THE PARTIES RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT.  THE PARTIES ALSO WAIVE ANY BOND OR SURETY OR SECURITY UPON SUCH BOND WHICH MIGHT, BUT FOR THIS WAIVER, BE REQUIRED OF ANY OF THE OTHER PARTIES.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS AGREEMENT, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.  THE PARTIES ACKNOWLEDGE THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO THIS AGREEMENT, THAT EACH HAS ALREADY RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THAT EACH WILL CONTINUE TO RELY ON THE WAIVER IN THEIR RELATED FUTURE DEALINGS.   THE PARTIES FURTHER WARRANT AND REPRESENT THAT EACH HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.   THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING, AND THE WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE TRANSACTION CONTEMPLATED HEREBY.  IN THE EVENT OF LITIGATION, THIS PROVISION WILL BE FILED IN COURT AS EACH PARTY'S WRITTEN CONSENT AND WAIVER TO A JURY TRIAL.

**10.10**   **Specific Performance**.  Each of the parties acknowledges and agrees that the other parties would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms or otherwise are breached.  Accordingly, each of the parties agrees that the other parties shall be entitled to an injunction or injunctions (without the requirement of posting a bond or proving actual damages) to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof in any court of the United States or any state thereof having jurisdiction over the parties and the matter (in addition to any other remedy to which they may be entitled, at Law or equity).  Furthermore, in the event of an actual breach or violation by any member of the Seller Group of **Sections 8.5** or **8.6**, the Restricted Period shall be tolled until such breach or violation has been duly cured.

**10.11**   **Counterparts**.  This Agreement may be executed and delivered by facsimile or email transmission of a portable document format (.pdf) copy and any number of counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

**[Signature Page Follows]**

IN WITNESS WHEREOF, the parties have executed this Purchase Agreement as of the day and year first above written.

3 PHASE ELEVATOR CORP.

By: _____

Name: Michael Strachan
Title: Chief Executive Officer

ALLIED ELEVATOR GROUP INC.

By: _____

Name: Ronald S. Tremblay
Title: President

OWNER

_____

Ronald S. Tremblay

*Signature Page to Asset Purchase Agreement*

## EXHIBIT A

## DEFINITIONS

"*Accounts Receivable*" is defined in **Section 2.1(c)**.

"*Actual Net Working Capital*" is defined in **Section 4.3(b)**.

"*Affiliate*" of any Person means any person directly or indirectly controlling, controlled by, or under common control with, any such Person and any officer, director or controlling person of such Person. The term "*Affiliate*" also includes any child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law or sister-in-law, including adoptive relationships, of such Person.

"*Agreement*" is defined in the preamble.

"*Ancillary Agreements*" means the Bill of Sale, the Assumption Agreement, the Lease Agreement and each agreement, document, instrument or certificate contemplated by this Agreement to be executed by Purchaser or any member of the Seller Group in connection with the consummation of the transactions contemplated by this Agreement, in each case only as applicable to the relevant party or parties to such Ancillary Agreement, as indicated by the context in which such term is used.

"*Arbiter*" means an accounting firm that is mutually agreed upon by Purchaser and Seller, or if (i) such firm is unable or unwilling to act in such capacity or (ii) Purchaser and Seller are not able to agree upon an accounting firm, then Duff & Phelps LLC shall serve as the Arbiter.

"*Assumed Contracts*" is defined in **Section 2.1(a)**.

"*Assumed Customers*" means any customer of Seller under the Assumed Contracts.

"*Assumed Liabilities*" is defined in **Section 3.1**.

"*Assumption Agreement*" is defined in **Section 5.3(d)**.

"*Bill of Sale*" is defined in **Section 5.2(b)**.

"*BLS*" is defined in **Section 10.8**.

"*Business*" is defined in the recitals.

"*Business Day*" means a day except a Saturday, Sunday or other day on which the banks in Boston, Massachusetts are authorized or required by Law to be closed.

"*Business Name*" means "Allied Elevator Group Inc." either alone or in combination with other words, graphics or designs, including all rights in said terms as a trade name, trademark, corporate name, service mark and domain name and any confusingly similar variation, derivative or translation thereof, together with all goodwill associated therewith.

"*Claims Notice*" is defined in **Section 9.2**.

"*Closing*" is defined in **Section 5.1**.

"*Closing Date*" is defined in the preamble; provided, however, that whenever the context of such term or the term "*Closing Date*" requires a specific effective time, such effective time shall be 12:01 A.M. Eastern Time on the Closing Date.

"*Closing Payment*" is defined in **Section 4.1**.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Confidential Information*" means all information of a confidential or proprietary nature (whether or not specifically labeled or identified as "confidential"), in any form or medium, that relates to or results from the operations, historical or projected financial results, products, services or research or development of the Business or its respective suppliers, distributors, customers, independent

contractors or other business relations. Confidential Information will be interpreted as broadly as possible to include all information of any sort (whether merely remembered or embodied in a tangible or intangible form) that is (a) related to the conduct of the Business as currently conducted and proposed to be conducted and (b) is not generally or publicly known. Confidential Information includes, but is not limited to, the following: (i) internal business information (including historical and projected financial information and budgets and information relating to strategic and staffing plans and practices, revenue figures, payroll figures, business, projections, training, marketing, promotional and sales plans and practices, cost, customer rate and pricing structures, risk management practices, negotiation strategies and practices, market maps, pipeline sales information, customer lists, routing lists, Tax records and accounting and business records and methods); (ii) identities of, individual requirements of, specific contractual arrangements with, and information about, employees (including personnel files and other information), customers, suppliers, distributors, independent contractors or other business relations and their confidential information; (iii) trade secrets, technology, know-how, compilations of data and analyses, techniques, systems, formulae, research, records, reports, manuals, flow charts, documentation, models, algorithms, data and data bases relating thereto; (iv) inventions, innovations, ideas, devices, improvements, developments, methods, processes, designs, analyses, drawings, photographs, reports and all similar or related information (whether or not patentable and whether or not reduced to practice); (v) copyrightable works; (vi) all other intellectual property of every kind and description; and (vii) all similar and related information in whatever form.

"*Core Representations*" is defined in **Section 9.1(b)**.

"*Customer Proposal*" is defined in **Section 8.7**.

"*Dispute Notice*" is defined in **Section 4.3(b)**.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended.

"*Estimated Net Working Capital*" is defined in **Section 4.2(b)**.

"*Expiration Date*" is defined in **Section 9.1(b)**.

"*Final Closing Statement*" is defined in **Section 4.3(a)**.

"*Final Determination*" means (A) a final non-appealed order of any court of competent jurisdiction that may be issued, together with (B) a certificate of counsel of the presenting party to the effect that such judgment is final and non-appealable and from a court of competent jurisdiction having proper authority.

"*GAAP*" means United States generally accepted accounting principles.

"*Government Contract*" means any agreement or contract that is an Assumed Contract between Seller, on the one hand, and (i) any Governmental Authority, (ii) any prime contractor of a Governmental Authority in its capacity as a prime contractor to any Governmental Authority or (iii) any subcontractor at any tier with respect to any agreement or contract of a type described in clauses (i) or (ii) above, on the other hand. A task, purchase or delivery order under a Government Contract shall not constitute a separate Government Contract, for purposes of this definition, but shall be part of the Government Contract to which it relates.

"*Governmental Authority*" means any government or political subdivision or regulatory authority, whether federal, state, local or foreign, or any agency or instrumentality of any such government or political subdivision or regulatory authority, or any federal state, municipal, local or foreign court or arbitrator (public or private).

"*Historical Financial Statements*" is defined in **Section 6.4**.

"*Holdback Amount*" means $140,000.

"*Indemnified Party*" is defined in **Section 9.2**.

"*Indemnifying Party*" is defined in **Section 9.2**.

"*Latest Financial Statements*" is defined in **Section 6.4**.

"*Law*" means any law, statute, code, ordinance, regulation or other requirement of any governmental or regulatory authority.

"*Lease Agreement*" means that certain Commercial Lease Agreement located at 100 Ferncroft Road, Unit 106, Danvers, MA 01923, dated as of the date hereof, by and between RTPT LLC, a Massachusetts limited liability company, and Purchaser.

"*Liability Claim*" is defined in **Section 9.2**.

"*Lien*" means any mortgage, pledge, hypothecation, deed of trust, lease, license, rights of others, right of first refusal, first offer or first negotiation, claim, security interest, encumbrance, easement, proxy, title defect, title retention agreement, voting trust agreement, transfer restriction, community property interest, option, lien, charge or similar restriction or limitation.

"*Losses*" is defined in **Section 9.1**.

"*Massachusetts Federal Court*" is defined in **Section 10.8**.

"*Monthly Financial Statements*" is defined in **Section 6.4**.

"*Net Working Capital*" shall mean an amount (which may be negative) equal to (x) the current assets to the extent included in the Purchased Assets <u>minus</u> (y) the current liabilities to the extent included in the Assumed Liabilities, in each case, determined as of 12:01 A.M. Eastern Time on the day prior to the Closing Date, determined in accordance with GAAP, subject to the accounting principles set forth in **Schedule 4.2(a)**.

"*Order*" means any order, judgment, injunction, award, decree, ruling, charge or writ of any Governmental Authority.

"*Ordinary Course of Business*" means the ordinary course of business of Seller consistent with past custom and practice, including with respect to quantity and frequency.

"*Owner*" is defined in the preamble.

"*Parent*" means PolyPhase Elevator Holding Company, a Delaware corporation.

"*Parent Stock*" means common stock, $0.01 par value per share of the Parent.

"*Permit*" means any permit, license, approval, consent or authorization issued by a Governmental Authority.

"*Person*" means any individual, estate, sole proprietorship, partnership, corporation, limited liability company, unincorporated society or association, trust or other entity.

"*Proceeding*" means any demand, charge, complaint, action, suit, proceeding, arbitration, hearing, grievance, audit, investigation, examination or claim of any kind (whether civil, criminal, administrative, investigative, informal or other, at law or in equity) commenced, filed, brought, conducted or heard by, against, to, of or before or otherwise involving, any Governmental Authority.

"*Purchase Price*" is defined in **Section 4.1**.

"*Purchased Assets*" is defined in **Section 2.1**.

"*Purchaser*" is defined in the preamble.

"*Restricted Period*" is defined in **Section 8.5**.

"*Retained Assets*" is defined in **Section 2.2**.

"*Retained Liabilities*" is defined in **Section 3.2**.

"*Retention Amount*" means an amount equal to $300,000.

"*Selected Courts*" is defined in **Section 10.8**.

"*Seller*" is defined in the preamble.

"*Seller Group*" is defined in the preamble.

"*Stock Amount*" means an amount equal to $100,000.

"*Stock Consideration*" means a number of shares of Parent Stock equal to the Stock Amount divided by 100.

"*Target Net Working Capital*" means an amount equal to $[427,516].

"*Tax*" means (a) any net income, alternative or add-on minimum tax, gross income, gross receipts, escheat, recapture, sales, use, ad valorem, value added, transfer, franchise, profits, license, withholding, payroll, employment, excise, severance, stamp, occupation, premium, property, environmental or windfall profit Tax, custom, duty or other Tax, governmental fee or other like assessment or charge of any kind whatsoever, together with any interest, penalty, addition to Tax or additional amount imposed by any Law or governmental or regulatory authority, (b) any liability for the payment of any amounts of any of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a party to any agreement or arrangement whereby liability for payment of such amounts was determined or taken into account with reference to the liability of any other entity and (c) any liability for the payment of any amounts as a result of being a party to any Tax sharing agreements or arrangements (whether or not written) or with respect to the payment of any amounts of any of the foregoing types as a result of any express or implied obligation to indemnify any other Person.

"*Tax Return*" means returns, declarations, reports, statements, elections, estimates, claims for refund, information returns or other documents (including any related or supporting schedules, statements or information, any amendment to the foregoing, and any sales and use and resale certificates) filed or required to be filed in connection with the determination, assessment, payment, deposit or collection of any Taxes of any party or the administration of any Laws, regulations or administrative requirements relating to any Taxes.

"*Territory*" is defined in **Section 8.5**.

"*Transfer Taxes*" is defined in **Section 8.2**.